In the
United States Court of Appeals
For the Seventh Circuit

No. 99-3322

United States of America,

Plaintiff-Appellee,

v.

Zoila Melgar,

Defendant-Appellant.

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 99-CR-13-C--Barbara B. Crabb, Judge.

Argued February 23, 2000--Decided September 19, 2000

Before Flaum, Chief Judge, Kanne and Diane P. Wood,
Circuit Judges.

Diane P. Wood, Circuit Judge.  Zoila Melgar pleaded guilty to one count of conspiracy to commit bank fraud and interstate transportation of counterfeit securities, conditioned on her right to challenge and now to appeal from the district court's denial of her motion to suppress evidence found inside a purse. The district court relied on the "inevitable discovery" doctrine to support its ruling, but we conclude that there is a more straightforward way to reach the same result. The purse was discovered by the police during the course of a search to which the renter of the hotel room had validly consented, and under the circumstances the police were permitted to investigate the contents of the purse as well. We therefore affirm the judgment of the district court, but on different grounds.

I

On January 29, 1999, officers of the Madison, Wisconsin, police department arrested four men on charges of passing counterfeit dividend checks supposedly issued by the Johnson Controls Corporation. A search of their car turned up a receipt showing that a Rita Velasquez had rented

Room 136 at a local Holiday Inn. Officers Louis Geblar and Bruce Frey, following up on that lead, drove to the hotel and went to the room in question. Joel Mejia responded to their knock on the door. He gave them permission to enter the room, where they found three other people: Celenia Mejia, Oscar Barrientos, and Jose Vasquez. Only Joel Mejia was fluent in English, and so the officers first asked him about the counterfeiting scheme, and then had him serve as a translator for the others. Geblar asked everyone present for consent to search their wallets or purses, and everyone agreed.

After this exchange, three more women arrived at the room: Rita Velasquez herself, Marcella Hernandez, and the defendant Zoila Melgar. Geblar asked Velasquez to step into the hall, where he searched her purse and jacket, found a counterfeit check, and arrested her. (Velasquez told him that the check was a joke, but he obviously found that story implausible.) On a more serious note, Velasquez also told Geblar that she saw Melgar give Hernandez a large number of checks, and that Hernandez had placed these checks in her purse.

Geblar returned to the room and next summoned Hernandez into the hall with him. There he searched her purse, but he found nothing incriminating in it. When he asked Velasquez to offer an explanation, she indicated that the checks were in a second purse Hernandez owned (a black one), that was still in the room. Geblar held up that purse and asked everyone whose purse it was, but no one claimed ownership. He then opened it and found an envelope with Hernandez's name on it that contained fake Johnson Control checks. At that point, he arrested Hernandez.

Once again, Geblar then asked Velasquez to accompany him to the hall. This time he asked for her permission to search the room. His request was a general one; he did not specifically ask her if the police could search particular closed containers within the room, nor did he ask her which of the numerous people then in the room were actually staying there. Velasquez gave her permission, which she signified both orally and by signing a scrap of paper (since lost) on which Geblar had scribbled out a consent form. At that point, the officers arrested and handcuffed everyone who had not already been arrested (including Melgar) and sent them to the station house.

After they all departed, the officers began their search of the room. Between the mattress and box springs of one of the beds, Frey found a floral purse that had no personalized markings on the outside. He opened it, and found inside an identification form that bore Melgar's photograph and the name "Diana Lopez." He also found a counterfeit Johnson Controls check payable to Diana Lopez. It is this evidence that incriminated Melgar, and it is the district court's refusal to suppress this evidence on the ground that it was obtained in violation of the Fourth Amendment that Melgar challenges in this appeal.

II

Melgar reasons that the evidence of the contents of the purse should have been suppressed because the police never obtained permission from anyone to search that particular closed container in Room 136. The police should have understood that the purse did not necessarily belong to Velasquez because there were several women in the room. Furthermore, she continues, the amount of luggage and other belongings scattered around made it obvious that Velasquez was not the sole occupant. Melgar concedes that Velasquez had at least apparent authority to authorize the search of the room itself, but she argues that this authority did not (either actually or apparently) extend to closed containers within the room. She also suggests that because the police had already matched up the other purses they had seen with the other women, they should have assumed that the purse underneath the mattress was Melgar's.

The district court saw enough possible merit in Melgar's arguments that it chose not to rely on consent in its ruling on the motion. Instead, it turned to an argument that had not been raised before the magistrate judge, upon whose report and recommendation the district court was relying. That argument was "inevitable discovery": had the police refrained from searching the floral purse then and there, out of concern for the lack of a warrant justifying such a search, they would simply have secured the room, obtained a warrant, and then opened the purse and obtained exactly the same damning materials they did. On appeal, the government raises another argument that it failed to make before the magistrate judge, namely, that the purse might have been subject to a valid search incident to an arrest.

Our cases, however, indicate that arguments not made before a magistrate judge are normally waived. See, e.g., Divane v. Krull Electric Co., 194 F.3d 845, 849 (7th Cir. 1999). It is also true that we have said that waiver is a flexible doctrine, see Old Ben Coal Co. v. Director, Office of Workers' Compensation Programs, 62 F.3d 1003, 1007 (7th Cir. 1995), but there are good reasons for the rule that district courts should not consider arguments not raised initially before the magistrate judge, even though their review in cases governed by 28 U.S.C. sec. 636(b)(1) is de novo. Failure to raise arguments will often mean that facts relevant to their resolution will not have been developed; one of the parties may be prejudiced by the untimely introduction of an argument (which Melgar argues is the case here). Additionally, a willingness to consider new arguments at the district court level would undercut the rule that the findings in a magistrate judge's report and recommendation are taken as established unless the party files objections to them. We need not decide here, however, whether there might be exceptions to this rule in unusual cases, or if this was such a case. The ground actually presented to the magistrate judge was consent. The government did not abandon that argument either before the district court or this court, and it is sufficient to support the district court's ruling, as we now explain.

The probable cause and warrant requirements of the Fourth Amendment are not applicable where a party consents to a search, Schneckloth v. Bustamonte, 412 U.S. 218 (1973), where a third party with common control over the searched premises consents, Florida v. Jimeno, 500 U.S. 248 (1991), or where an individual with apparent authority to consent does so, Illinois v. Rodriguez, 497 U.S. 177 (1990). Here, there is no dispute that Velasquez was the person who had rented the room, that she gave her consent for a search, and that she had authority (or at least apparent authority) to do so. Generally, consent to search a space includes consent to search containers within that space where a reasonable officer would construe the consent to extend to the container. Jimeno, 500 U.S. at 251; see also Wyoming v. Houghton, 526 U.S. 295, 302 (1999) (applying this rule to searches of a container within an automobile, if the container is of a type that might conceal the object of the search); United States v. Ross, 456 U.S. 798 (1982) (same).

Melgar responds that there is an exception for closed containers that the police have no reason

to believe are under the control of the person who agreed to the search. She relies principally on our decision in United States v. Rodriguez, 888 F.2d 519 (7th Cir. 1989), in which we held that a spouse's consent to search a room in a union hall where her husband was sleeping did not extend to her husband's briefcase, which had the word "Mike" on the outside. Id. at 524. The opinion reasoned that consent to search premises cannot always extend to every closed container within them, because such a rule would imply that consent to search the United Airlines baggage facility at O'Hare Airport would justify searching everyone's luggage--a proposition we were not willing to endorse. On the other hand, the government responds, in United States v. Saadeh, 61 F.3d 510 (7th Cir. 1995), this court upheld a workplace search in which the police made it clear they were looking for drugs, the employer consented to the search of an entire facility, and the police found drugs in a closed toolbox and desk. Id. at 516-19. Saadeh, according to the government, controls this case and demonstrates that the police were entitled to search the contents of the floral purse.

In our view, neither Rodriguez nor Saadeh is directly on point, but taken together they can guide us to the correct result. In a sense, the real question for closed container searches is which way the risk of uncertainty should run. Is such a search permissible only if the police have positive knowledge that the closed container is also under the authority of the person who originally consented to the search (Melgar's view), or is it permissible if the police do not have reliable information that the container is not under the authorizer's control. We are not aware of any case that has taken the strict view represented by the first of these possibilities. With respect to the search of the briefcase in Rodriguez, the police had positive information that it did not belong to his spouse (the name label on the outside). The same is true for the suitcases in a baggage facility, which must have on the outside an identification tag with the passenger's name and address. No reasonable police officer, having obtained the airline's permission to search the facility, could think that the airline is also authorized to speak for each individual passenger whose luggage is stored there. See also United States v. Fultz, 146 F.3d 1102, 1106 (9th Cir. 1998) (property owner made clear that the boxes were not hers); United States v. Welch, 4 F.3d 761, 765 (9th Cir. 1993) (purse clearly did not belong to driver).

Here, the police had no reason to know that the

floral purse they found under the mattress did not belong to Velasquez. They knew that the room had been rented to Velasquez; they knew that at least one of the women, Hernandez, had two purses; and there were no exterior markings on the purse that should have alerted them to the fact that it belonged to another person. Coupling those facts with the fact that Velasquez knew that they were searching for evidence of counterfeit dividend checks, which could easily fit inside the purse, we conclude that the scope of Velasquez's consent encompassed their right to look into this container.

A contrary rule would impose an impossible burden on the police. It would mean that they could never search closed containers within a dwelling (including hotel rooms) without asking the person whose consent is being given ex ante about every item they might encounter. We note that there is no possibility of such a rule for automobile searches, because the Supreme Court has already authorized this type of container search in that context. See Ross, supra; Houghton, supra. Our conclusion here rests in part on the discussion in Houghton that indicates that the container rule rests on general principles of Fourth Amendment law that do not depend on the special attributes of automobile searches. See 526 U.S. at 302.

III

Because the police had no reason to believe that Velasquez could not consent to the search of the floral purse, and because (as Melgar conceded) Velasquez gave her consent to a complete search of Room 136, we hold that the search of the purse did not violate the Fourth Amendment and that the district court correctly declined to grant Melgar's motion to suppress. The judgment of the district court is Affirmed.