**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 07a0255n.06
Filed: April 5, 2007

**No. 05-6692**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA**, | ) | |
| | ) | ON APPEAL FROM THE |
| *Plaintiff-Appellee*, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| v. | ) | DISTRICT OF TENNESSEE |
| | ) | |
| **ANTONIO GRAYER** | ) | **O P I N I O N** |
| | ) | |
| *Defendant-Appellant*. | ) | |

BEFORE:    COLE, SUTTON, and COOK, Circuit Judges.

**R. GUY COLE, JR., Circuit Judge.** Defendant-Appellant Antonio Grayer appeals a district court order denying his motion to suppress evidence after he conditionally pleaded guilty to being (1) a felon in possession of a firearm, and (2) a felon in possession of ammunition, both in violation of 18 U.S.C. § 922(g). On appeal, Grayer raises various claims under the Fourth and Fifth Amendment, originally presented in his motion to suppress, relating to the police officers' conduct surrounding his arrest. Because we find no constitutional infirmities, we **AFFIRM**.

**I. BACKGROUND**

On November 25, 2003, at around dusk, Officer Chad Cunningham stopped a Toyota Camry driving without its headlights illuminated. During the traffic stop, Officer Cunningham checked the status of the Camry's license plate and received a report that the car had been stolen. Upon the

officer's questioning of the Camry's lone occupant, Eric Faulkner, Faulkner explained that he had

borrowed the car from Antonio Grayer, who often resided at 4953 Shelter Cove, only one house

away from where Faulkner was pulled over. Officer Cunningham then cuffed Faulkner, placed him

in the back of his squad car, and searched the Camry. In the trunk, Officer Cunningham found a box

of .40 caliber Federal Hydra-Shok ammunition[1] with ten rounds missing. Officer Cunningham then

called for backup before proceeding to 4953 Shelter Cove.

Three more officers arrived at the scene accompanied by a police dog. Officer Cunningham,

along with a second officer, approached 4953 Shelter Cove's front door; a third officer went to the

back area of the house; and a fourth officer stayed near the front area. Cunningham knocked on the

front door, and a man (Grayer) answered the door. Cunningham asked the man if he was Antonio

Grayer or perhaps known as "Big Tony." Grayer confirmed both. Cunningham then asked if Grayer

could step outside and speak to the officers regarding his vehicle. Grayer voluntarily exited the

house, whereupon he was questioned about ownership of the Camry and admitted that it was his. The

officers then took Grayer into custody, searched him, and placed him in the back of a squad car.

The officers then returned to 4953 Shelter Cove and spoke with a woman, Jacqueline Clay,

who also resided at the house. Clay, whom Officer Cunningham knew to be the home's caretaker

while the homeowner was away serving a jail term, signed a written consent form permitting the

---

[1]"Federal" refers to the ammunition's brand, which has no relation to the United States government. Hydra-Shok is the Federal Cartridge Company's "premium defense ammo," which it claims is the top choice for law-enforcement agencies nationwide and "satisfies even the FBI's stringent testing requirements." *See* http://www.federalpremium.com/default.asp?menu=1&s1=7. These bullets are designed for their "stopping power" and "deep penetration." *See id*.

officers to search the premises. Cunningham asked Clay if there were any weapons in the house. Clay hesitantly took the officers to a back bedroom that she occupied and pointed to a clothes hamper. At the bottom of the hamper, the officers found a pistol matching the ammunition found in the Camry's trunk.

Officer Cunningham then returned to Grayer; advised him of his *Miranda* rights, which he waived; and questioned him about the ammunition, gun, and stolen Camry. Grayer admitted to possession and ownership of the Camry, its contents, and the pistol found in Clay's bedroom.

Although Faulkner was released from custody, Grayer was arrested and charged in a two-count indictment with being (1) a felon in possession of a firearm, and (2) a felon in possession of ammunition, both in violation of 18 U.S.C. § 922(g). Grayer filed a motion to suppress evidence, challenging various aspects of the officers' investigation and his arrest. After conducting a suppression hearing, the district court denied Grayer's motion in its entirety. Grayer then entered into a conditional plea agreement that allowed him to appeal the suppression ruling. The district court sentenced Grayer to seventy months' imprisonment followed by two years' supervised release.

Grayer now appeals the suppression ruling, raising the following Fourth and Fifth Amendment issues presented in his motion to suppress: (1) Clay lacked authority to consent to a search of 4953 Shelter Cove; (2) the officers constructively entered 4953 Shelter Cove without a warrant when they seized Grayer; and (3) the officers lacked the requisite reasonable suspicion necessary to approach 4953 Shelter Cove, question Grayer, and seize him.

## II. ANALYSIS

### A. Standard of Review

"In reviewing a district court's denial of a motion to suppress evidence, this court reviews the district court's findings of fact for clear error, and its legal conclusions de novo." *United States v. Gillis,* 358 F.3d 386, 390 (6th Cir. 2004). "The ultimate questions of whether the police had reasonable suspicion to briefly detain a suspect, probable cause to arrest him, or a reasonable basis to conclude that a third party had authority to consent to a search, are questions of law and we therefore review them de novo." *United States v. Hudson*, 405 F.3d 425, 431 (6th Cir. 2005). With respect to the reasonable suspicion required for investigative detentions, this Court has noted that "the district court is at an institutional advantage, having observed the testimony of the witnesses and understanding local conditions, in making this determination," and, therefore, "due weight should be given to inferences drawn from facts by resident judges." *Id.* (citations omitted). "The evidence must be viewed in the light most likely to support the district court's decision." *United States v. Sanford*, 476 F.3d 391, 394 (6th Cir. 2007) (citation and quotation marks omitted).

**B. Discussion**

1. Clay's Authority to Consent

The Fourth Amendment generally prohibits warrantless searches of homes. This general prohibition, however, does not apply where the police obtain voluntary consent from the individual whose property is searched or from a third party who possesses common authority over the premises. *Gillis*, 358 F.3d at 390 (citing *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990)). Common authority is not to be implied from a mere interest that a third party has in the property, but from "mutual use . . . by persons generally having joint access or control for most purposes." *Id.* (quoting *United States v. Matlock*, 415 U.S. 164, 172 n.7 (1974)). Even if a third party does not possess actual common

authority over the area that was searched, there is no Fourth Amendment violation when the police rely in good faith on a third party's apparent authority to consent to the search. *Rodriguez*, 497 U.S. at 188-89.

The district court found that the officers received consent from Clay and that she had authority to consent to the search. Grayer, however, maintains that Clay lacked authority to consent to a search of 4953 Shelter Cove and, specifically, the back bedroom containing the pistol. Further, Grayer contends that the police, when confronted with an "ambiguous situation," must inquire further regarding the consenter's authority and that was not done here.

Here, the officers were not confronted with an ambiguous situation. Clay had authority over 4953 Shelter Cove because she was (1) the homeowner's live-in girlfriend, and (2) expressly authorized by the homeowner to live in and take care of the home during the homeowner's incarceration. *See, e.g.*, *United States v. Moore,* 917 F.2d 215, 223 (6th Cir. 1990) (holding that live-in girlfriend had common authority to consent to search of premises); *Matlock*, 415 U.S. at 171 n.7 ("Common authority rests . . . on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched."). Indeed, this authority is not unlimited. For example, Clay's authority may not have extended to locked bedrooms and other areas or items of exclusive use by others. *See, e.g.*, *United States v. Waller*, 426 F.3d 838, 845 (6th Cir. 2005) (holding that resident did not have authority to consent to search of other's locked luggage on premises). In this case, however, Clay took the officers to a back bedroom that she claimed to

occupy. It was not locked. The room contained her personal effects. She had knowledge of the contents of the room when she pointed to a clothes hamper that hid the gun. Nothing in the record indicates that Clay consented to a search outside the scope of her authority, nor that the officers acted unreasonably when they relied on Clay's consent to search the back bedroom. *See United States v. Jenkins*, 92 F.3d 430, 436 (6th Cir. 1996) ("When one person consents to a search of property owned by another, the consent is valid if 'the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief that the consenting party had authority over the premises.'" (quoting *Rodriguez*, 497 U.S. at 188)). Thus, Grayer's argument that Clay lacked authority to consent to the search the residence is meritless.

　　　　2. Warrantless Entry into 4953 Shelter Cove

"[T]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Payton,* 445 U.S. at 589-90. In certain situations, we have held that *Payton* applies to seizures that occur even outside the home.

In *United States v. Morgan*, 743 F.2d 1158 (6th Cir. 1984), we explained that a "constructive entry" may occur when a suspect emerges from a house "in response to coercive police conduct." *Id*. at 1166; *accord United States v. Thomas*, F.3d 274, 277 (6th Cir. 2005) (explaining that a constructive entry occurs "when the police, while not entering the house, deploy overbearing tactics that essentially force the individual out of the home"). Coercive police conduct is "such a show of authority that [the] Defendant reasonably believed he had no choice but to comply." *United States v. Saari*, 272 F.3d 804, 809 (6th Cir. 2001). There is nothing, however, preventing the police from

knocking on a home's door and questioning a suspect or an individual with information about an investigation. *See, e.g.*, *Thomas*, 430 F.3d at 277 (citing, among others, *Ewolski v. City of Brunswick*, 287 F.3d 492, 504-05 (6th Cir. 2002) (approving of "knock and talk" investigations)). And if, during the course of this questioning, the suspect willingly and voluntarily acquiesces to noncoercive police requests to leave the protection of the house, then, absent a show of force that would provide a basis for a reasonable person to believe he was compelled to leave the house, a subsequent outside-the-home seizure does not offend *Payton*. *See id*.

Grayer argues that it was reasonable for him to believe that he was under arrest once the officers knocked on his door and, therefore, the officers constructively entered the residence without a warrant. Grayer points out that the house was surrounded by four police officers, a K-9 unit was present, and three police cars (along with an unmarked Chevrolet Suburban) were parked on the street outside the house.

Even assuming these facts as true, Grayer's argument fails. The officers' show of force did not rise to the level of a constructive entry. None of the hallmarks of constructive entry were present: (1) drawn weapons; (2) raised voices; (3) coercive demands; or (4) a large number of officers in plain sight. *See, e.g.*, *Saari*, 272 F.3d at 808-09 (constructive entry where police knocked forcefully and where one officer had a twelve-gauge, pump-action shotgun in the "ready position" and the other officers had their service weapons drawn); *Morgan*, 743 F.2d at 1161 (constructive entry where ten officers surrounded the house, blocked the suspect's car, "flooded the house with spotlights[,] and summoned [the suspect] from his mother's home with the blaring call of a bullhorn"); *accord Sharar v. Felsing*, 128 F.3d 810, 819 (3d Cir. 1997) (constructive entry where police surrounded the house,

pointed machine guns at the windows, and ordered the occupants out); *United States v. Al-Azzawy*, 784 F.2d 890, 893 (9th Cir. 1985) (constructive entry where "the police had completely surrounded [suspect's] trailer with their weapons drawn and ordered him through a bullhorn to leave the trailer and drop to his knees").

The record reflects that only two officers approached the front door of the residence. The other two officers were stationed to the side and back of the house and were not visible from the front door. Likewise, according to Officer Cunningham's testimony, the three police squad cars and unmarked police Suburban were parked in a manner blocked from Grayer's view from the front door. Further, neither officer at the door had his gun drawn. Those two officers simply knocked on the door, asked the man who answered the door if he was Grayer, and asked him to step outside. Indeed, Grayer testified that he complied with that request willingly. Without more, this does not amount to a constructive entry. *See Thomas*, 430 F.3d at 278 (near-identical facts).

3. <u>Reasonable, Articulable Suspicion to Approach 4953 Shelter Cove, Question Grayer, and Detain Him</u>

There are three types of permissible encounters between the police and citizens: (1) a consensual encounter, which may be initiated without any objective level of suspicion; (2) an investigative detention (or *Terry* stop), which, if non-consensual, must be supported by a reasonable, articulable suspicion of criminal activity; and (3) an arrest, valid only if supported by probable cause. *See, e.g.*, *United States v. Avery*, 137 F.3d 343, 352 (6th Cir. 1997). Grayer argues that the district court erred in finding that the officers had the requisite reasonable suspicion to approach 4953 Shelter Cove, question him, and subsequently detain him.

As a preliminary matter, no level of suspicion was required before the officers approached the residence and questioned Grayer, or whomever happened to answer the door. Accordingly, the knock on the door and subsequent discussion was a purely consensual encounter, which officers may initiate without any objective level of suspicion. *See Bennett v. City of Eastpointe*, 410 F.3d 810, 821 (6th Cir. 2005) ("A purely consensual encounter between a police officer and a citizen does not implicate the Fourth Amendment."). We have expressly approved of these so called "knock and talk" consensual encounters as a legitimate investigative procedure so long as the encounter does not evolve into a constructive entry. *See Thomas*, 430 F.3d at 277 ("Consensual encounters do not lose their propriety, moreover, merely because they take place at the entrance of a citizen's home."). Therefore, Grayer's argument that the officers lacked the requisite suspicion to approach 4953 Shelter Cove and question him is meritless.

Grayer's argument that the officers lacked the requisite reasonable suspicion necessary to seize him is also meritless. Once Grayer admitted to owning the stolen Camry, the officers had probable cause to arrest him. *See, e.g.*, *Rawlings v. Kentucky*, 448 U.S. 98, 111 (1980) (holding that police "clearly had probable cause" to place defendant under arrest after he admitted to possessing contraband); *United States v. Burton*, 334 F.3d 514, 519-20 (6th Cir. 2003) (holding that defendant's voluntary admission to possession of contraband "undoubtedly" gave officers probable cause to arrest him); *United States v. Torres-Guevara*, 147 F.3d 1261, 1266 (10th Cir.1998) (concluding that where the defendant's "encounter with the officers was consensual at the time she admitted carrying drugs[,] . . . this admission provided probable cause for her arrest"). Because reasonable suspicion requires a lesser quantum of proof than probable cause, *Griffin v. Wisconsin*, 483 U.S. 868, 878 n.4 (1987),

the officers, ipso facto, had sufficient reasonable suspicion to seize Grayer.

## III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's order denying Grayer's motion to suppress.