*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 08a0202p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

> *Plaintiff-Appellant,*

v.

No. 07-5517

FREDERICK PURCELL, JR.,

> *Defendant-Appellee.*

---

Appeal from the United States District Court
for the Eastern District of Kentucky at Covington.
No. 06-00061—David L. Bunning, District Judge.

Argued: March 13, 2008

Decided and Filed: May 29, 2008

Before: MOORE, GILMAN, and SUTTON, Circuit Judges.

---

## COUNSEL

**ARGUED:** Andrew Sparks, ASSISTANT UNITED STATES ATTORNEY, Lexington, Kentucky, for Appellant. Wende C. Cross, CROSS, SMITH & ASSOCIATES, Cincinnati, Ohio, for Appellee. **ON BRIEF:** Andrew Sparks, Charles P. Wisdom, Jr., ASSISTANT UNITED STATES ATTORNEYS, Lexington, Kentucky, for Appellant. Wende C. Cross, CROSS, SMITH & ASSOCIATES, Cincinnati, Ohio, for Appellee.

MOORE, J., delivered the opinion of the court, in which GILMAN, J., joined. SUTTON, J. (pp. 10-12), delivered a separate opinion concurring in part and dissenting in part.

---

## OPINION

---

KAREN NELSON MOORE, Circuit Judge. In this case we are asked whether the discovery of men's clothing in a bag that a female claimed to own erases for future bags the apparent authority that justified the officers' warrantless search of the first bag, thereby making a subsequent search illegal. We hold that the discovery of men's clothing eviscerated any apparent authority, but that the officers could have reestablished apparent authority by asking the supposed bag owner to verify her control over the other bags to be searched. Furthermore, we hold that exigent circumstances did not justify the illegal search. Because the officers in the instant case did not reestablish apparent authority and could not justify proceeding with a warrantless search by claiming an exigency, we hold that district court did not err when it suppressed the firearm that officers discovered after any

1

apparent authority dissipated, and we **AFFIRM** the district court's partial grant of the defendant's motion to suppress.

## I.  BACKGROUND

### A.  Factual Background

On June 28, 2006, Special Agent John Scott ("Scott") and the Southern Ohio Fugitive Apprehension Strike Team ("SOFAST")[1] received a tip that Frederick Purcell, Jr. ("Purcell"), an escapee from prison, was staying at a hotel in Kentucky.  The tip indicated that Purcell was residing at the hotel with his girlfriend, Yolande Crist ("Crist").  As Scott and the other members of SOFAST drove to the hotel, they received information that Purcell "was a meth manufacturer and that Blue Ash[, Ohio police] had arrested him for manufacturing meth."  Joint Appendix ("J.A.") at 64 (Hr'g Tr., John Scott Test. at 6:23-24).

Upon arrival at the hotel, the SOFAST agents quickly identified Purcell standing outside and arrested him without incident.  After arresting Purcell, Scott and the other SOFAST agents went to Purcell's hotel room.  The agents were concerned that, given what they knew of his history, Purcell may have been manufacturing methamphetamine in the room.  As Agent Scott noted, "I'm basically an ATF agent so my knowledge of meth manufacturing is basically the explosive potential of it.  So we were concerned about endangerment of the hotel guests."  J.A. at 65 (Scott at 7:15-17).

The officers knocked on the door to Purcell's room and could hear the shower running as well as a fan blowing.  After about three minutes, Crist opened the door and assured the officers that there was no methamphetamine manufacturing occurring in the room.  Crist then gave her consent for the officers to take a quick look around the room.  Although Crist would later authorize a full search of the room, during this first search the agents did only what Crist authorized them to do: perform a cursory sweep of the room.

During this initial sweep of the room, the agents observed "two duffel type bag suitcases near the door" and a backpack located between the bed and window at some distance from the two duffel bags. (Omitted from J.A., Scott at 16:19-20); J.A. at 95 (Dec. 14, 2006, Hr'g Tr., M. Duane Rolfsen Test. at 58:21-24).  Clothes covered most of the rest of the floor, but despite the mess, the agents noticed several suspicious items, such as possible marijuana leaves, steel wool, a butane torch, the shower operating at full strength, and a box fan blowing air out from the shower.  Having observed these suspicious items, the agents called for assistance from officers with experience identifying and handling methamphetamine labs.

Agent Matthew Duane Rolfsen ("Rolfsen") of the Northern Kentucky Drug Strike Force was called to the scene because he was certified to process methamphetamine labs and had dealt with Purcell on a prior occasion.  Agent Rolfsen, like the first agents to arrive on the scene, was also concerned about the hazards that a methamphetamine lab in a hotel room might pose:

> Our immediate concern, due to his past history and what he was actually serving time on when he escaped, was the meth lab itself, was for the community safety and the hotel safety and the patrons' safety that were in the hotel.  If there is a meth lab, there is a lot of chemical hazards.  There's a lot of safety hazards.  It's a possibility of dying from the fumes and the chemicals involved in making methamphetamine.

J.A. at 81 (Rolfsen at 33:9-15).

---

[1]The U.S. Marshal Service runs SOFAST, which employs members of various state and federal law-enforcement agencies.

Upon arriving at the hotel, Agent Rolfsen talked to Agent Scott and then conducted his own cursory sweep of the hotel room. Agent Rolfsen observed the same suspicious items as Agent Scott, but Agent Rolfsen also noticed cookware "consistent with manufacturing methamphetamine," cutting agent, "a metal spoon with burnt material," a torch, "brass material consistent with use for making pipes to smoke" drugs, and "plastic tubes, which is consistent with snorting various drugs." J.A. at 83 (Rolfsen at 35:2-13). Although the agents identified some evidence, such as the cookware, that was consistent with methamphetamine production, it is notable that Agent Rolfsen did not smell any of the telltale chemical odors that often accompany methamphetamine labs. Agent Rolfsen noted, however, that the lack of smell was not conclusive: "once you've done the cook, there's not always a smell. Depends how much material is still there." J.A. at 89 (Rolfsen at 49:10-14).

After making his initial sweep of the room, Agent Rolfsen asked Crist for and received permission to conduct a more complete search. As Agent Rolfsen and other officers began the search, they asked Crist whether there was anything in the room that could be dangerous, and "[s]he indicated there was a firearm in the room." J.A. at 84 (Rolfsen at 36:20-24). Crist did not mention any methamphetamine-related dangers, but she did state that a firearm was in one of the bags in the room, although she was not sure which one. Agent Rolfsen moved toward the duffel bags by the door and pointed to "a green brown bag" and asked Crist "[i]s it this bag?" Crist responded that "it might be." J.A. at 85 (Rolfsen at 37:1-3). Agent Rolfsen opened that first duffel bag near the door, and as he was searching it Crist "said that was her bag because she set her purse on top of it." J.A. at 94 (Rolfsen at 56:6-7). Upon opening the bag, Agent Rolfsen discovered marijuana but no firearm. In addition to the marijuana, Agent Rolfsen discovered that the bag did not contain Crist's personal effects, as one might expect, but instead contained only men's clothing.

The discovery of the men's clothing inside the bag indicated that it was actually Purcell's bag, not Crist's, as she had claimed. This was not a complete surprise for the agents because they knew that Purcell owned some of the items in the room even though they did not know initially which bags were his; "[Crist] definitely said there was [sic] items in that room that belonged to Fred Purcell." J.A. at 92 (Rolfsen at 53:15-16). Although Agent Rolfsen realized that Crist had misstated her ownership of the bag, he did not ask her to verify whether she owned any of the other bags in the room. Shortly thereafter, another agent found the firearm in a brown-green backpack that was not sitting near the other closed bags by the door but was instead sitting "on the floor by the bed and between the bed and the window." J.A. at 95 (Rolfsen at 58:21-24). After discovering the firearm, the agents asked Crist who owned the backpack, and Crist noted that she owned the backpack itself, but she had given it to Purcell for his use.

As it turned out, Purcell was the sole user of both the bag containing the firearm and the bag containing the marijuana. None of Crist's effects were in Purcell's bags, he did not give her permission to go through his bags, and she never went through them. Crist did own the backpack itself, but at the time of the search, Purcell had exclusive use of the backpack that contained the firearm.

## B. Procedural Background

On August 9, 2006, a grand jury indicted Purcell for being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1), a fugitive from justice knowingly possessing a firearm in violation of 18 U.S.C. § 922(g)(2), an unlawful user of marijuana in possession of a firearm in violation of 18 U.S.C. § 922(g)(3), and for possession of marijuana in violation of 21 U.S.C. § 844(a).[2]

---

[2]The indictment also included a count seeking forfeiture of the firearm.

Prior to trial, on November 21, 2006, Purcell filed a motion to suppress both the firearm and the marijuana that the agents discovered in the search of his luggage. On March 23, 2007, the district court granted Purcell's request to suppress the firearm and denied Purcell's request to suppress the marijuana.

In reaching its conclusion, the district court rejected the government's assertion that the search was justified under the exigent-circumstances exception to the Fourth Amendment. The district court did not believe that the agents were legitimately concerned about the dangers of a methamphetamine lab after completing their cursory sweeps of the room; the agents' "actions in asking a second time for consent, that time to search the room, strongly suggests that the immediate danger was no longer present." J.A. at 21 (Mem. Op. & Order at 9). The district court went on to say that "[t]here is nothing to suggest that a search of the luggage was necessary as part of the exigency of ensuring there was no meth lab in the room, nor would it be objectively reasonable to find that such a search was within the scope of Crist's initial consent to look around to verify the area was safe." J.A. at 22 (Mem. Op. & Order at 10).

The district court also rejected the government's assertion that Crist had either actual or apparent authority to consent to the search of the bag that held the firearm. First, the district court concluded that Crist did not have actual authority to consent to the search of either bag: "Ms. Crist gave no testimony that would suggest she enjoyed any mutual use, access, or control of the duffel bag or backpack or the items within it, and the Government has provided no evidence to refute this claim." J.A. at 28 (Mem. Op. & Order at 16). Second, according to the district court, there was apparent authority for the officers to search the first bag because at the time of the search of the first bag "there was no evidence offered to suggest reason to doubt the accuracy or truthfulness of her response that the duffel bag was hers." J.A. at 31 (Mem. Op. & Order at 19). In contrast, the district court found that Crist's apparent authority was "extinguished with the search of that first bag" after the officers found it was filled with men's clothing, leaving Crist with no apparent authority to consent to the search of the second bag. J.A. at 32 (Mem. Op. & Order at 20).

On April 3, 2007, the government filed a motion for reconsideration, asking the district court to use *United States v. Atchley*, 474 F.3d 840 (6th Cir.), *cert. denied*, ___ U.S. ___, 127 S. Ct. 2447 (2007), to hold that the search of all of the luggage in Purcell's hotel room was valid under the exigency exception to the Fourth Amendment. On April 18, 2007, the district denied the government's motion for reconsideration of the district court's suppression order, concluding that *Atchley* did not justify a warrantless search in this case. The district court believed that, in contrast to *Atchley*, "further search was not driven by any objectively reasonable urgency for fear of a hidden lab or dangerous chemicals, but rather for the firearm specifically, or perhaps maybe some other weapon or item that might pose a danger generally to those searching." J.A. at 45 (Apr. 18, 2007, Mem. Order at 9).

On April 20, 2007, the government filed an interlocutory appeal challenging the district court's suppression of the firearm. We have authority to hear this case under 18 U.S.C. § 3731, authorizing the court of appeals to hear interlocutory appeals brought by the United States following a district court's suppression of evidence that "is a substantial proof of a fact material in the proceeding." 18 U.S.C. § 3731.

## II. ANALYSIS

"In assessing a challenge to the district court's ruling on a motion to suppress, we review the district court's factual findings for clear error, and its legal conclusions *de novo*." *United States v. Waller*, 426 F.3d 838, 843 (6th Cir. 2005); *accord Atchley*, 474 F.3d at 847.

Our search jurisprudence typically requires officers to possess a warrant before conducting a search. There are, however, exceptions to the warrant requirement. "One of those 'well-delineated' exceptions is the consent of the person searched. An officer with consent needs neither a warrant nor probable cause to conduct a constitutional search." *United States v. Jenkins*, 92 F.3d 430, 436 (6th Cir. 1996), *cert. denied*, 520 U.S. 1170 (1997). And one of the other exceptions is the existence of exigent circumstances. *Mincey v. Arizona*, 437 U.S. 385, 392-393 (1978). On appeal, the government has presented alternative arguments attempting to justify the agents' warrantless search under one of these two exceptions, providing no other justifications for the warrantless search other than arguing that (1) exigent circumstances justified the search, and (2) Crist had apparent authority to consent to the search of the backpack. We conclude that there was neither any exigent circumstance nor apparent authority to justify the search of the backpack.

## A. Exigent Circumstances

The government claims that the warrantless search that led to the discovery of the firearm was justified by exigent circumstances. Although the Fourth Amendment makes a warrant or obtaining consent a prerequisite for a legal search,"'[t]he need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.'" *Id.* (quoting *Wayne v. United States*, 318 F.2d 205, 212 (D.C. Cir. 1963)). Qualification for this exception is not easy, for "[w]hen there is neither a warrant nor consent, courts will only permit a search or seizure to stand under extraordinary circumstances." *United States v. Chambers*, 395 F.3d 563, 565 (6th Cir. 2005).

In order to establish the applicability of this exception to the Fourth Amendment's requirements, "[i]t is the government's burden to prove the existence of exigency." *Atchley*, 474 F.3d at 851. "While it is not possible to articulate a succinct yet exhaustive list of circumstances that qualify as 'exigent,' we have previously characterized the situations in which warrantless entries are justified as lying within one of four general categories: (1) hot pursuit of a fleeing felon, (2) imminent destruction of evidence, (3) the need to prevent a suspect's escape, and (4) a risk of danger to the police or others." *United States v. Rohrig*, 98 F.3d 1506, 1515 (6th Cir. 1996). Courts that have found that exigent circumstances existed "uniformly cite the need for prompt action by government personnel, and conclude that delay to secure a warrant would be unacceptable under the circumstances." *Id.* at 1517. The case at hand presents a question of whether the circumstances indicated a risk of danger that made it unacceptable for the agents to delay their search in order procure a warrant.

Methamphetamine labs are rightly regarded as highly dangerous. "Certain of the chemicals used in this process are toxic and inherently dangerous. During the manufacturing process, some of these chemicals, which are highly flammable, present a threat of explosion. These chemicals pose an additional risk should anything go wrong during the manufacturing process. The process produces toxic gases, which pose a serious risk to those who inhale them, and other dangerous byproducts." *United States v. Layne*, 324 F.3d 464, 470 (6th Cir.), *cert. denied*, 540 U.S. 888 (2003). "Many of these chemicals emit dangerous fumes and vapors. The byproduct of the process includes highly flammable and explosive phosphine gas." *Id.* Although methamphetamine labs are dangerous, the danger is primarily tied to the heating process and the resulting fumes or explosiveness; on their own, the ingredients are safe enough that they are common, easily accessible products. *See* Drug Enforcement Administration, *Fact Sheet: Fast Facts About Meth*, http://www.usdoj.gov/dea/pubs/pressrel/methfact03.html (last visited Apr. 28, 2008).

In the instant case, the government claims that the possibility that Purcell was manufacturing methamphetamine in his hotel room created a danger to the agents and hotel guests that justified the warrantless search of Purcell's luggage. According to the government, our holding in *Atchley* compels the conclusion that an exigency existed, but we disagree.

In the case at hand, the only reasons why the officers suspected that there was a methamphetamine lab in Purcell's room were that he had previously operated methamphetamine labs and they noticed some drug-related items in his hotel room. However, not one agent testified to believing that methamphetamine cooking was ongoing when the agents arrived. This is in sharp contrast to *Atchley*. In that case, there was a significant amount of evidence indicating that the dangerous manufacture of methamphetamine was ongoing: "Officer Engle stated that he smelled a chemical which he associated with methamphetamine manufacturing. When the officers entered, they observed in plain view two large glass jars appearing to contain a solvent, a large bottle of gas line anti-freeze, rubbing alcohol, and a police radio scanner." *Atchley*, 474 F.3d at 845. Given that the manufacture of methamphetamine is so dangerous, the *Atchley* court found the warrantless search justified because the officers had significant evidence of methamphetamine manufacture; in contrast, we observed that evidence of simply drug use or possession "would not establish the exigency necessary to validate a warrantless search." *Id.* at 851.

In Purcell's case, there was no evidence to suggest that methamphetamine manufacture was ongoing, thus there was no exigency to justify searching Purcell's luggage. In the absence of an exigency, *Atchley* simply does not control this case. Had there been evidence of an ongoing methamphetamine lab, *Atchley* would have entitled the agents to search small containers, such as small pieces of luggage, even though an operational laboratory could not have fit in Purcell's baggage. *See id.* at 846 ("The district court found that although Cobb and Engle's search of the refrigerator, ice chest, ammunition can, and drawer was not justified as part of the protective sweep, it was nonetheless lawful because the items that were in plain view gave the officers probable cause to suspect that the motel room served as a methamphetamine laboratory."). In this case, however, the predicate that would justify the search of small places such as luggage—evidence of a methamphetamine lab that creates an exigency—was simply not present.

Furthermore, evidence of a methamphetamine laboratory by itself is not always sufficient to create an exigency. *Id.* at 851 n.6 ("We do not intend to say that there should be a *per se* rule that whenever evidence of a methamphetamine laboratory is apparent, there is always exigency."). In this case, however, not only was there no evidence of an operating methamphetamine laboratory, but also the government's claims of exigency appear to be only a post hoc justification for the warrantless search because the agents searching Purcell's room did not seem particularly concerned for their own safety or the safety of other hotel guests after they had conducted their sweep of Purcell's room. If the officers were truly concerned about a dangerous condition, why did the agents twice ask Crist for permission to search the room? And if the agents were worried about a methamphetamine laboratory, why were they searching in the luggage for a firearm? The answers to these questions belie the government's assertion that the agents were concerned about a possible methamphetamine lab in Purcell's hotel room. We therefore hold that exigent circumstances did not justify the warrantless search of Purcell's backpack.

**B. Consent**

The government's only other argument is that Crist's consent justified the warrantless search of Purcell's luggage. In order to consent to a search, the person purporting to consent must possess either actual or apparent authority over the item or place to be searched. *United States v. Caldwell*, 518 F.3d 426, 429 (6th Cir. 2008). Once an individual with actual or apparent authority consents to the search, "[t]he standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). Thus, when an officer receives consent, he is allowed to search only what is reasonably covered by the consent given; "[i]t is very likely unreasonable to think that a suspect, by consenting to the search of his trunk [of his car], has agreed to the breaking open of a locked briefcase within the trunk, but it is otherwise with respect to a closed paper bag." *Id.* at 251-52.

Purcell did not and was not entitled to bring an interlocutory appeal challenging the district court's denial of his motion to suppress the marijuana. *United States v. Shameizadeh*, 41 F.3d 266, 267 (6th Cir. 1994) (Order) ("Although 18 U.S.C. § 3731 permits the government to take an immediate appeal from an order *granting* a pretrial motion to suppress, that statute does not provide for a cross-appeal by a defendant. . . . Thus, while the defendants may raise as part of the government's appeal any alternative arguments which would have supported the order of suppression, they may not . . . raise any arguments as to evidence not ordered suppressed by the district court."). When defending the grant of the motion suppressing the firearm, Purcell acknowledges that apparent authority justified the search of the first duffel bag, which yielded the marijuana. Appellee Br. at 12 ("Thus, as the district court properly concluded, '[the officers'] reliance upon Crist's response [regarding the first bag] was reasonable, as there was no evidence offered to suggest reason to doubt the accuracy or truthfulness of her response that the duffel bag was hers.'" (quoting Mem. & Op. at 19)). We therefore assume that the district court was correct in holding that apparent authority justified the search of the first bag. We do, however, hold that neither actual nor apparent authority justified the search of the second bag, which yielded the firearm.

### 1. Actual Authority

Actual authority in third-party consent cases "rests . . . on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the [property] to be searched." *United States v. Matlock*, 415 U.S. 164, 171 n.7 (1974). Crist offered uncontroverted testimony establishing that her personal effects were not in Purcell's bags, Purcell exercised exclusive control over his bags, and Purcell never gave Crist permission to open his bags. These factors would all tend to establish that Crist lacked actual authority to consent to the search of the bag containing Purcell's clothing and the firearm. On appeal, however, the government does not claim that Crist had actual authority to consent to the search of Purcell's bags; therefore, we do not address whether Crist had actual authority to consent to the search, and we simply assume that she did not possess actual authority.

### 2. Apparent Authority

"We have held that even where third-party consent comes from an individual without actual authority over the property searched, there is no Fourth Amendment violation if the police conducted the search in good faith reliance on the third-party's *apparent authority* to authorize the search through her consent." *Morgan*, 435 F.3d 660, 663 (6th Cir. 2006) (finding apparent authority where a wife claimed to have authority to access to her husband's computer). In investigating whether officers reasonably concluded an individual possessed apparent authority, the "determination of consent . . . must 'be judged against an objective standard: would the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief' that the consenting party had authority over the [property]?" *Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990) (second omission in original) (quoting *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968)). In deciding whether the officers acted reasonably, "[t]he most we can ask is if the officer's interpretation of the spoken words was reasonable in light of the contextual information that the record does contain." *Jenkins*, 92 F.3d at 436.

In the case at hand, when the agents began their search of the luggage in the hotel room, they had a good-faith basis to believe that Crist had authority to consent. Crist asserted that the duffel bag that yielded the marijuana was hers, and her purse was sitting on top of the duffel bag. Crist's statements created apparent authority for the officers, and their search of the duffel bag was justified

because they acted in good-faith reliance upon Crist's assertions.[3] Purcell acknowledges in his brief that the officers reasonably relied upon Crist's assertion of authority over the duffel bag.

Even if the officers' search of the duffel bag was justified by Crist's apparent authority, apparent authority cannot exist if there is ambiguity as to the asserted authority and the searching officers do not take steps to resolve the ambiguity. "The government cannot establish that its agents reasonably relied upon a third party's apparent authority if agents, faced with an ambiguous situation, nevertheless proceed without making further inquiry. If the agents do not learn enough, if the circumstances make it unclear whether the property about to be searched is subject to mutual use by the person giving consent, then warrantless entry is unlawful without further inquiry." *Waller*, 426 F.3d at 846 (internal quotation marks omitted).

Before the officers began their search, the situation was relatively unambiguous—Crist claimed the duffel bag was hers, and the officers had no reason to doubt that. However, once the officers found that the first bag contained men's clothing and none of Crist's personal effects, ambiguity clouded Crist's authority to consent to the search of the backpack.[4] When a situation starts as unambiguous but subsequent discoveries create ambiguity, any apparent authority evaporates. *See Rodriguez*, 497 U.S. at 188 ("Even when the invitation is accompanied by an explicit assertion that the person lives there, the surrounding circumstances could conceivably be such that a reasonable person would doubt its truth and not act upon it without further inquiry."); *Jenkins*, 92 F.3d at 437 ("Of course, if the consenter provides additional information, the context may change in such a manner that no reasonable officer would maintain the default assumption.").

Once ambiguity erases any apparent authority, it is not difficult for the searching officers to reestablish the would-be-consenter's authority. The options for searching officers are simple: either they may get a warrant, or they may simply ask the would-be-consenter whether he or she possesses the authority to consent to the search of the other items that the officers wish to explore. *See Waller*, 426 F.3d at 849 ("The officers' failure to make further inquiry is especially pronounced in this case because Howard was in the next room when the police found the luggage, and Waller was being detained outside the apartment. It would not have been burdensome for the officers to have asked Howard whether the luggage belonged to him (or to either of the women who were present in the apartment) prior to opening the bag."). Although Crist was standing outside the hotel room during the entire search, the agents never asked Crist to clarify her authority over any of the other bags in the room. Therefore, Crist's apparent authority, which justified the search of the first bag, dissipated upon the discovery of the men's clothing and was not reestablished, leaving Crist without apparent authority to consent to the search of the backpack.

The government attempts to argue that even if Crist's initial assertions of control over the bags are not enough to sustain her apparent authority after the discovery of the men's clothing, the fact that Crist was in an intimate relationship with Purcell provided another basis for her apparent authority. Being in an intimate relationship, however, does not endow a would-be-consenter with

---

[3] The dissent mischaracterizes our opinion as requiring that police possess "positive knowledge" of joint access and control before a search is permissible. Dissenting Op. at 12. Our holding that the search of the first bag was reasonable refutes the dissent's mistaken interpretation. Positive knowledge is simply not required; Crist's uncontradicted statements established apparent authority that dissipated only when the officers discovered evidence that undermined her assertions of authority. We ask only whether "a [person] of reasonable caution" would believe "that the consenting party had authority over the [property]," *Rodriguez*, 497 U.S. at 188, which is hardly the onerous standard that the dissent suggests.

[4] The dissent raises a hypothetical case that is clearly distinguishable from the one before us today. While there *might* be a situation where the search of the first bag would have revealed evidence that "*confirmed* that the couple shared luggage," Dissenting Op. at 11, such a situation does not exist in this case. The only clothing that the police discovered in the bag was men's clothing, which hardly "confirms" that Crist and Purcell shared luggage.

any additional sheen of apparent authority that would survive the discovery of evidence that contradicts the consenter's asserted authority. *See Morgan*, 435 F.3d at 663 (finding apparent authority from a wife's assertion of common authority, but not from the fact that the party granting consent was the defendant's wife); *Waller*, 426 F.3d at 848 (approvingly citing *United States v. Salinas-Cano*, 959 F.2d 861 (10th Cir. 1992), where the Tenth Circuit did not automatically find consent where a girlfriend attempted to consent to a search of her boyfriend's briefcase). Thus, the facts surrounding any particular intimate relationship might contribute to the officers' good-faith basis for initially believing a would-be-consenter's assertion of authority, but that good-faith belief is still subject to the same constraints that apply whenever new information comes to light that creates ambiguity as to apparent authority.[5]

Thus, we conclude that the discovery of the men's clothing in the duffle bag that Crist claimed was hers created ambiguity sufficient to erase her apparent authority and necessitated that the officers reestablish Crist's apparent authority. Because the officers continued their search without reestablishing Crist's apparent authority, the firearm was discovered as part of an illegal search, and the district court did not err when it suppressed the firearm.

### III. CONCLUSION

For the foregoing reasons, we conclude that exigent circumstances did not justify the search of the hotel room and that Crist did not have apparent authority to consent to the search of the second bag. Accordingly, the district court did not err when it suppressed the firearm, and we **AFFIRM** the district court's partial grant of the motion to suppress.

---

[5]The dissent urges this court to create a new default assumption that "itinerant, intimate couples sharing close quarters have joint use of indistinguishable containers within the space they occupy." Dissenting Op. at 12. Although there are no doubt many couples who do share luggage when they travel, the possible travel habits of some is hardly a sound basis for an unprecedented expansion of police authority.

---

**CONCURRING IN PART, DISSENTING IN PART**

---

SUTTON, Circuit Judge, concurring in part and dissenting in part. The question at hand is whether the officers' search of the backpack was "[]reasonable." U.S. Const. amend. IV. In answering that question, we know (1) that searches based solely upon consent are reasonable, *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973), (2) that each joint user of a container "clearly ha[s] authority to consent to its search" because one user "assume[s] the risk that [the other] would allow someone else to look inside," *Frazier v. Cupp*, 394 U.S. 731, 740 (1969), and (3) that officers need not be "correct" that an individual has authority to consent to a search but must only "reasonably believe[]" that the individual has common authority over the premises and items to be searched, *Illinois v. Rodriguez*, 497 U.S. 177, 185, 189 (1990).

The officers reasonably relied on Crist's consent to search the backpack for several reasons. Crist, to start, had unquestioned authority over the hotel room: She rented the room in her name; she opened the door to the officers; and her personal effects were in the room. No one thus contests Crist's authority to permit the officers to enter the hotel room and to search it.

Once Crist permitted the officers to enter the hotel room, the only spaces not already in plain view—and therefore potentially covered by her further consent to search the room—would have been the closet, the bathroom, the dresser and the luggage. Crist's consent to search the room necessarily would seem to cover the closet, the bathroom and the dresser. And if it covered these areas, why wouldn't it cover the luggage of this non-platonic couple—particularly after what Crist told the officers and after what the officers saw? Crist told the officers that she and Purcell were in an intimate relationship and that they had stayed together in the hotel room for several days. And she confirmed that the first bag the officers opened was her own. What the officers saw confirmed Crist's authority to permit the officers to search the two bags or at least confirmed the absence of any exclusivity between Crist's luggage and Purcell's. Crist's possessions were scattered about the room. None of the bags in the hotel room was locked, individually marked or otherwise naturally affiliated with one or the other of them. And no clear arrangement of the containers indicated that some were more private than others. On these facts alone, it would seem reasonable for officers to infer that a couple sharing a bed would share access to unmarked, unlocked and androgynous-looking luggage.

But there is more. Crist authorized a targeted search, and she also knew the general contents of the two bags she gave the officers permission to search. After allowing a protective sweep of the hotel room, Crist specifically consented to the officers' search for a "firearm" when they asked if there was "anything in the room that could hurt" them. JA 84. She "direct[ed] [the officers] to look in certain bags because she believed that was where the gun" might be, JA 76, which itself confirmed mutual access to the bags. And when the officers found orange peels in a bag of marijuana in the first duffel bag, Crist told them that the orange peels "help[] keep [the marijuana] fresh," JA 88, further suggesting mutual access to the bag. An individual's "knowledge of the contents" of a searched space bolsters the reasonableness of an officer's reliance on that individual's authority to consent to the search. *United States v. Grayer*, 232 F. App'x 446, 449 (6th Cir. Apr. 5, 2007).

Most strikingly, however, Purcell was not an everyday traveler; he was a fugitive. As the officers well knew in arresting Purcell before they entered the hotel room, he was a prison escapee, a member of a group that generally travels lightly and that is more likely to rely on the generosity of others than on its own possessions in getting by from day to day. What then was unreasonable about believing that Crist had authority to consent to the search of the luggage when she had rented

the room, knew the contents of both bags that were searched and had stayed there for several days—and not just with any companion but with a fugitive companion?

One might wonder, indeed, whether fugitives have *any* legitimate expectation of privacy in their belongings. Individuals released from prison on parole, with the government's consent, have substantially diminished privacy rights, making reasonable searches unaccompanied by a warrant and without individualized suspicion. *See Samson v. California*, 547 U.S. 843, 856 (2006). Why reward a fugitive, who necessarily left prison without the government's consent, by giving him more constitutional privacy than he had before he escaped from prison? *See United States v. Roy*, 734 F.2d 108, 112 (2d Cir. 1984) (holding that a fugitive has no more Fourth Amendment rights than when he was in prison in part because "[a] contrary determination would offer judicial encouragement to the act of escape and would reward an escapee for his illegal conduct").

But we need not climb that wall now. Purcell's known status as a fugitive at a minimum contributed to the reasonableness of the officers' judgment that Crist had authority to consent to the search of the luggage. The officers could reasonably infer that Purcell did not bring the duffel bag and backpack with him when he escaped from prison. And while it is possible that he purchased the bags after his escape, that is not the question; the issue is whether an officer could reasonably conclude that an individual living on the lam was sharing luggage with an intimate traveling companion—as indeed turned out to be the case. The officers' reliance on all of these circumstances in the end turns on precisely the kinds of "factual and practical considerations of everyday life on which reasonable and prudent" officers may act, *Brinegar v. United States*, 338 U.S. 160, 175 (1949), and on this record an officer "of reasonable caution" would be "warrant[ed] . . . in the belief" that this couple shared access to luggage, *Rodriguez*, 497 U.S. at 188 (internal quotation marks omitted).

*United States v. Waller*, 426 F.3d 838 (6th Cir. 2005), does not hold (or even say) otherwise. It merely observes that in some circumstances it may become "unclear whether the property about to be searched"—there a suitcase—"is subject to 'mutual use' by the person giving consent." *Id.* at 846 (internal quotation marks omitted). But the circumstances of Waller's case are not the circumstances of Purcell's. Waller was not a fugitive; his suitcase was found in a house he did not occupy; and there was no evidence that *any* of Waller's possessions were "mutual[ly] use[d]" by anyone else. *Id.* at 845–47, 849.

The presence of male clothing in one bag also did not invalidate the search. Crist told the officers, it is well to remember, that the first container searched was "her bag." JA 94. If the officers perceived Crist's asserted authority over the bag as truthful, as they reasonably could have, then the presence of Purcell's clothes *confirmed* that the couple shared luggage. And if Crist was merely confused about which bag contained her possessions, that confusion would buttress a reasonable belief that no clear boundaries existed between the possessions of the pair, which is hardly an improbable scenario when it comes to a traveling couple. Why the varied contents of one bag, which plainly included jointly used items (marijuana), *must* be viewed to undermine rather than reinforce the inference of mutual use escapes me. It is no more unusual for a fugitive to keep his clothes in a companion's luggage than it is unusual for a fugitive to stay in a hotel rented in a companion's name. The circumstances made it a virtual certainty that some male clothes would be in the luggage, indeed perhaps even a male, prison-issue, orange jump suit. There is nothing surprising (or authority diminishing) about finding Purcell's clothes in a bag that Crist owned and understandably shared with her fugitive companion.

It is true that "[b]eing in an intimate relationship . . . does not endow a would-be-consenter with any additional sheen of apparent authority that would survive the discovery of evidence that *contradicts* the consenter's asserted authority." Maj. Op. at 9 (emphasis added). But that is beside the point. The intimate relationship helps to explain the presence of male clothing in Crist's bag and

therefore shows that nothing "contradict[ed]" Crist's authority to permit inspection of the room's containers. If the officers started with the reasonable premise that itinerant, intimate couples sharing close quarters have joint use of indistinguishable containers within the space they occupy (especially when one of the pair is a fugitive), their discovery of male clothing did more to reaffirm that premise than to refute it. The question after all is not whether the officers were *certain* that Crist exercised "joint access or control for most purposes," *United States v. Matlock*, 415 U.S. 164, 171 n.7 (1974); it is whether there was enough *uncertainty* to undermine the officers' "reasonable . . . belief that [she] had authority to consent," *Rodriguez*, 497 U.S. at 187 (internal quotation marks omitted).

In *United States v. Melgar*, 227 F.3d 1038 (7th Cir. 2000), the Seventh Circuit faced a similar situation. In upholding the search of a floral purse, it held that apparent authority exists over containers in a jointly occupied living space unless "the police . . . have reliable information that the container is *not* under the authorizer's control." *Id.* at 1041. "[T]he real question for closed container searches," Judge Wood recognized, "is which way the risk of uncertainty should run." *Id.* The court resolved this question by rejecting a comparable rule to the one the majority embraces today—that uncertainty should be resolved by making consent searches "permissible only if the police have positive knowledge that the closed container is also under the authority of the person who originally consented"—because such a rule "would impose an impossible burden on the police. It would mean that they could *never* search closed containers within a dwelling (*including hotel rooms*) without asking the person whose consent is being given *ex ante* about every item they might encounter." *Id.* at 1041–42 (second emphasis added). At least one other circuit has embraced this view. *See United States v. Navarro*, 169 F.3d 228, 232 (5th Cir. 1999) (holding that apparent authority existed where there was no evidence that the consenter "advised that the luggage in the vehicle was not his"). We should do the same here. The majority seeing it differently, I respectfully dissent from this part of its opinion.