Filed 8/23/23; Certified for Publication 9/13/23 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| JOSE CRUZ,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>CITY OF MERCED,<br><br>Defendant and Respondent. | F083402<br><br>(Merced Super. Ct.<br>No. 20CV-02663)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from an order of the Superior Court of Merced County.  Brian L. McCabe, Judge.

Messing Adam & Jasmine, Gary M. Messing, and Lina Balciunas Cockrell for Plaintiff and Appellant.

Lozano Smith and Wiley R. Driskill for Defendant and Respondent.

-ooOoo-

**SEE DISSENTING OPINION**

Appellant and petitioner and former police officer Jose Cruz was terminated from the Merced City Police Department (Department) based on allegations he conducted an illegal search, submitted a false police report, and committed perjury at a court hearing. Cruz appealed to the personnel board (Board), which found the City of Merced (City) failed to show Cruz had submitted a false police report or had conducted an illegal search. However, the Board found that Cruz was not truthful in explaining certain details concerning the search. Consequently, the Board rejected the majority of charges against Cruz, but sustained portions of charges relating to his untruthfulness. The Board recommended that Cruz not be terminated, but instead that he be demoted without backpay.

The Merced City Manager reversed the decision and upheld Cruz's termination. The trial court rejected Cruz's challenges to the city manager's decision.

We conclude the trial court erred in upholding several of the charges against Cruz. While we do uphold several other charges, we remand for the trial court to determine whether the surviving charges are sufficient to support the consequence of termination.

## FACTS

### Underlying Incident According to Cruz[1]

Cruz worked as a police officer for the City of Merced for about five years.

On the morning of August 29, 2018, Cruz drove his patrol vehicle to the Siesta Motel. A group of individuals, including one Martin Olvera, were conversing in the parking lot. Cruz was familiar with Olvera, having observed him in the same area during the preceding weeks. As Cruz exited his vehicle, Olvera began to walk away mid-conversation. Olvera walked away at a "higher speed" and appeared to grip his abdomen.

Eventually, Olvera returned to Cruz. Cruz knew Olvera was "on PRCS out of San Joaquin" County.[2] Cruz confirmed Olvera's PRCS status on his in-vehicle computer.

---

[1] Based on Officer Cruz's testimony before the Board.

[2] PRCS stands for post release community supervision.

2.

Because of his PRCS status, Olvera was supposed to have a permission slip to be in another county. However, he did not have that documentation.

Cruz detained Olvera and called his PRCS officer. The PRCS officer did not answer, so Cruz let Olvera go.

As Cruz was pulling away at a stop sign, individuals told him that Olvera had a gun.

Later, Cruz drove to the Gateway Motel. As he arrived, he saw someone run into a room he was familiar with, room 27. Cruz was concerned because if the individual was Olvera, he might be violent given that he had known gang-affiliations. Cruz saw people looking at him from inside the room, saw moving people through the window, and heard a lot of shuffling around.

Cruz called for backup and knocked on the door. Ms. Pompa cracked the door open a little bit and spoke with Cruz. Based on Cruz's prior interactions with Ms. Pompa, his observations of the room décor, and her later statements at the scene, Cruz understood that Pompa lived in the room.

Ms. Pompa had a pit bull and Cruz saw at least three people in the room. Cruz was wary of entering the room without backup because it would not have been safe.

Ms. Pompa told Cruz he needed a warrant if he wanted to come into the room. However, Pompa eventually exited the room, spoke with Cruz, and gave him permission to enter the room.

Cruz observed multiple individuals in the room, including Olvera, Annabelle Perez, Amber De La Cruz, and two other males. At least one of the males had a recent criminal history, including multiple felony warrants.

Cruz searched the bathroom and discovered a white floral backpack inside. The details of Cruz's interaction with this backpack are central to this appeal and are discussed in detail later in this opinion. For present purposes, we note that Cruz placed the backpack on the bathroom sink, the backpack opened, and was shortly thereafter

3.

placed back onto the ground. Cruz later asked who owned the backpack, to which Ms. Perez eventually replied that it was hers. After that interaction, Cruz then searched the backpack and found a gun.

While Cruz believed he could search the handbag[3] by virtue of Ms. Pompa's consent to search the bathroom, he figured he would also ask Ms. Perez so that he had multiple, redundant justifications for searching the bag. Also, asking for consent improves officers' reputation in the community. It looked to Cruz that Perez nodded in response to his request to search. Cruz believed Ms. Perez and Olvera were in a romantic relationship.

Cruz began dictating his police report for the incident during his shift later that day and completed it shortly after his shift ended. Cruz said the events at the Gateway Motel that day were not memorable nor out of the ordinary for him.

**Probable Cause Declaration**

Cruz wrote a probable cause declaration stating that as the door to room 27 opened, Olvera emerged from the restroom area. Olvera's PRCS status was still active at the time. The declaration stated, "a search of the restroom yielded a small white backpack with a .380 automatic Jennings firearm with a scratched off serial number. The handgun had a magazine with ammunition in it. There was no round in the chamber." The declaration further stated that Ms. Perez admitted to owning the bag in which the gun was found. Olvera was listed in Perez's "favorites" on her phone "with red hearts and an image depicting Olvera shirtless."

**Police Report**

Cruz's police report of the incident stated, in part:

---

[3] The backpack is at various times referred to as a backpack, handbag, or purse. We will generally try to match however it is referenced in the portion of the record to which we are citing.

4.

"[After] Olvera was secured in the prisoner-compartment area of my marked patrol vehicle by an assisting officer[,] [¶] I once again spoke with Pompa, who identified Richard Thomas Maya, contact, as being the renter of the room. Maya was identified by his California identification card. Maya briefly gave permission for our search of the area where Olvera had been seen entering, the restroom…. [¶] In performing a safety sweep of the room and of the small restroom area, I saw what appeared to be a smaller white-with-flowery-print backpack. The backpack was affixed with zippers from topside to its sides and [had] one zipper to the front. I asked who the backpack belonged to, and Perez advised it was hers. Perez consented to a search of her backpack. [¶] … [¶] … In checking the backpack, I could tell there were women's hygiene items within it …. Also within the bag was what appeared to be a blouse with its store tags attached and a bra. Beneath those items was a small spray perfume bottle and what was obviously a handgun. [¶] … The firearm had a shiny chrome finish to it." (Unnecessary capitalization omitted.)

**Bodycam Video**

Cruz's bodycam video recorded an interaction he had with Ms. Pompa outside the room. Cruz told Pompa he saw "him" run into the room and that "he" had a gun. Pompa said he went into the bathroom "so you are going to want to look in the bathroom, if you want, but that's the only place...."

Shortly after, Ms. Pompa again said Olvera went into the bathroom. Cruz replied, "[A]lright, you understand what I'm looking for right?" Pompa nodded. Cruz asked, "[A]nd you're cool with it?" Pompa nodded and said, "Yes." She emphasized, "I'm mad that there is even one in my house."[4]

Later, the video shows Cruz enter the bathroom and search through its contents. Though the camera is not oriented for an optimal view, it can be discerned that Cruz picks up a floral backpack from the floor in front of the shower and places it on a nearby sink. Cruz then searches the shower and a clothing piled contained therein. Eventually, Cruz grabs the backpack on the sink. He holds it with his left hand for approximately two seconds before his right hand begins to move in the direction of the bag. The bag

[4] The City briefly suggests Ms. Pompa's consent to search the bathroom was somehow unclear. Based on these relatively clear expressions, we disagree.

then moves completely out of view just before a zipping sound occurs as Cruz's right hand moves from right to left. For the next four or five seconds, the bag remains out of view, a sound consistent with items being moved around can be heard, and a reflection of Cruz's head seen in the mirror shows he is looking downward. Then, another zipper sound is heard, and the bag returns to view being held in Cruz's left hand. Cruz then sets the bag on the ground. The total time between the apparent "opening" zipper sound and the apparent "closing" zipper sound is about five seconds. Cruz then begins to search other areas of the bathroom.

About a minute later, Cruz can be heard saying, "Is this your bag, miss? The little white one?" A few seconds later, Cruz can be seen holding what appears to be the same backpack in his left hand. A female voice is heard saying, "[N]o, that's not mine." Another female voice, which testimony would eventually establish as Ms. Perez's, is heard shortly thereafter saying, "[T]hat's mine." Cruz says, "[M]ind if I go through it?" Perez moves her head in a roughly diagonal fashion down and to the left. Cruz then begins to search the backpack and remove its contents. The subsequent contents of the video are consistent with Cruz locating a gun in the backpack.

**Criminal Prosecution of Perez and Olvera**

Ms. Perez and Olvera were booked on weapons and gang charges. On September 11, 2018, Perez filed a motion to suppress evidence based on "the warrantless search" of her bag. The motion was considered on the same date at the preliminary hearing. Deputy District Attorney Tyson McCoy (McCoy), who was assigned to the case, filed no written opposition to the motion. He also did not watch the bodycam footage before the hearing.

Cruz testified at the hearing. During that testimony, the following exchange occurred:

"Q. Now, when you went and searched the bathroom you found that white flower bag on the ground; right?

"A. Yes, ma'am.

6.

"Q. You picked it up and put it on the sink?

"A. Yes.

"Q. And then you actually unzipped the bag and looked inside; right?

"A. Not – I didn't, like, search through it other than to put it on the sink.

"Q. But you unzipped the bag and looked inside?

"A. I believe I unzipped the front portion of it because of the method in which I grabbed it, but I put it on the sink.

"Q. Okay. What do you mean because of the method in which you grabbed it? Did it require you opening the bag?

"A. No. The way I gripped it and put it on the sink, I think I opened one of the zippers because when I grabbed the straps.

"Q. Okay. So when you put it on the sink, you did unzip the bag?

"A. Eventually, but not then.

"Q. So it's your testimony that when you put the bag on the sink you did not unzip it at that point?

"A. I do not recall that, but it's on video.

"Q. Okay. So you do have – you did have a body cam activated at that point?

"A. Yes, ma'am.

"Q. And I'm going to play you a portion of that body cam."

The beginning of the bodycam video was played, and the following exchange ensued.

"Q. Okay. If we could pause, and this is 20 seconds in. Did you see the bag on the sink?

"A. I just put it down.

7.

"Q. Okay.  Previously in the 20 seconds we watched did you see the bag on the sink?

"A. Yes.

"Q.  And you saw that you unzipped the bag at that point?

"A. Yeah.  The way in which I grabbed it, yes, you can see my hand.

"Q. Okay.  And you can hear you actually unzipping the bag; right?

"A. It drapes over the bag.  Correct.

"Q. Sorry.  What drapes over the bag?

"A. My hand as to grip it.

"Q. Okay.  So are you indicating that you unzipped the bag because that was the way you were holding it?

"A. Initially, yes, ma'am.

"Q. You were not opening the bag to search the bag?

"A. If I would have been searching it, this video would still be showing me searching it instead of just putting it back down next to the cabinet."

**Court's Discussion**

At the end of the hearing, the court discussed its thinking.  First, it observed that Ms. Perez's testimony at the hearing was not "particularly credible."

Next, the court stated:

"I have some real concerns about what I observed on the video in the defense exhibit.  [¶]  It seems pretty clear to the Court that when that backpack was picked up from the floor and placed on the sink it was closed, and you can clearly hear on the video … at some point later … you hear a zipping noise, which I'm inferring is an unzipping and about seven or eight seconds of doing something that you can't really see much of on the video, and then you hear another zipping noise,[] and so the Court is inferring that the bag was re-zipped, and then it was placed back down on the ground, and then a short time later after searching the rest of the bathroom is when the officer turns around and asks Ms. Perez whether or not he can search.…"

8.

The court later continued,

"[I]t seems that the gun was located at the bottom; however, … I don't know if the officer just doesn't recall or what happened, but I am concerned because it's pretty clear to the Court that that bag was opened and is contrary to the testimony that was provided to the Court about what happened.  [¶]  The quandary I'm in is I don't know whether the officer saw anything in there or not because there were about seven or eight seconds of appearing that something could have been going on."

The court stated that it was inclined to suppress the evidence.

McCoy argued that it was unlikely Cruz had seen the firearm during the initial bag-opening because "any officer would … immediately take control of that weapon and not just set it down nonchalantly when it's got a firearm in the purse.  So I think that does tend to corroborate that he was saying that he wasn't searching it."

Defense counsel argued that another reasonable interpretation was that if Cruz saw a firearm, "he may have realized at that point that he needed to get consent or else the firearm was going to be suppressed."

The court asked McCoy whether any illegality of the initial search would be vitiated by the subsequent consent.  McCoy initially said that fruit of the poisonous tree doctrine would apply, but then said: "[B]ut I do think there's … another issue here, too, where … Ms. Pompa, who is the resident of the motel room, gave consent to search the bathroom."

McCoy also argued that while you could hear zipping on the video, there was "no rifling" through the purse.

The court stated, "I'm just trying to find in my notes he said Pompa … gave consent.  I didn't see that in my notes."  The court said it would take the matter under submission pending preparation of a draft preliminary hearing transcript.

At a continued hearing, the court stated it reviewed the preliminary hearing transcript.  The court noted that Cruz testified Ms. Pompa consented to a search of the restroom.  The court stated that Pompa was "the occupant of the motel room" and that

9.

"[i]t looked like some sort of long-term rental based upon the video…." However, it then referenced testimony from Cruz indicating Pompa refused to allow him inside. The court stated, "Based upon that particular evidence, the Court does not find that it is clear that Ms. Pompa actually gave her consent, so I cannot … uphold the search on those grounds."[5]

The court found Cruz's testimony to not be credible. The court concluded that Cruz did search the bag "initially." While the court also found that Ms. Perez "gave consent" for Cruz to search her bag, it concluded the previous search of the bag tainted the subsequent consent-based search.

Based on the ruling, the charges against Ms. Perez were dismissed.

After the hearing, as McCoy and Cruz were walking to the parking lot, Cruz said his glove got stuck on the bag. McCoy said, "Oh, give me a break, who's going to believe that."

On September 20, 2018, McCoy informed the Department about what had transpired. McCoy conveyed to Lieutenant Struble concerns he had with Cruz's credibility with respect to the case.

**Subsequent Events**

Cruz continued working as an officer from the hearing in September 2018 through June 2019. Effective September 24, 2018, Cruz was promoted to senior police officer and received a pay increase. Cruz's performance review covering September 25, 2017, to September 24, 2018, was positive. The review included a statement from a deputy district attorney indicating Cruz was "doing a great job" and that his reports "contain

---

[5] In this regard, the court was confused. Cruz testified that when he *first arrived*, Ms. Pompa refused him entry. Later, she allowed him in and consented to a search of the bathroom because that was where Olvera had been.

In sum, the evidence was clear that Ms. Pompa consented to a search of the bathroom.

10.

everything they need to.  She said he was "incredibly conscientious," and that she "honestly can't think of anything that he needs to improve."

**Internal Investigation**

On June 13, 2019, Lieutenant Jay Struble interrogated Cruz regarding the allegations that he prepared a false police report and provided false testimony in court on September 13, 2018.

Cruz said that because Ms. Pompa had already given consent, he "wasn't so much worried about that, I was worried about an unsecured firearm."

Cruz said that as he grabbed the bag, he heard unzipping.  He was "dumbfounded" and wondered how he had done that.  He "believe[d]" it was his glove that had gotten stuck on the zipper.  Then, he shook off his hand.

Cruz said he had "planned on flipping [the bag] away from me, just the way I manipulate things, I'm afraid of sharps."[6]  Cruz said that by the time he felt the snag, the bag had already become unzipped.  Cruz looked down to see what caused the bag to unzip, whether it was the cuff of his sleeve or his glove, etc.  Cruz could see dark fabric inside the opened bag but did not rifle through the bag.

Cruz clearly stated that he did not intentionally unzip the backpack but did intentionally zip it closed.

**Termination Proceedings**

On July 10, 2019, Captain Bimley West provided Cruz with written notice of the Department's intent to fire Cruz.  The notice stated it was based on findings that Cruz had violated the following provisions of the Merced Police Department's Policy Manual (MPDPM) and the California Penal Code.  While the notice did not number each charge, subsequent documents, including the trial court's order that is the subject of the present appeal, numbered them in order.  We will use that numbering for ease of identification.

---

[6] Cruz later elaborated that he intended to grab the backpack on its opposite end, face it away from himself, and look on its other side.

11.

*Charge 1*

Charge 1 was based on a violation of MPDPM Standard of Conduct 323.5.8(a), which reads:

"(a) Failure to disclose or misrepresenting material facts, or making any false or misleading statement on any application, examination form, or other official document, report or form, or during the course of any work-related investigation."

In its explication of this charge, the notice stated:

"Officer Cruz, you completed a police report regarding the incident []; however, your report was incomplete. In your report, you did not mention anything about your actions of opening the backpack ("bag") and looking inside prior to establishing ownership. The police report indicates that the bag was searched after ownership was established. By failing to include the bag being opened and looked into prior to establishing ownership, you misrepresented material facts to the case."

*Charge 2*

Charge 2 was based on MPDPM Standard of Conduct 323.5.8(e), which reads:

"(e) Disparaging remarks or conduct concerning duly constituted authority to the extent that such conduct disrupts the efficiency of this department or subverts the good order, efficiency and discipline of this department or that would tend to discredit any of its members"

In its explication of this charge, the notice stated:

"Your conduct in this incident clearly disrupts the efficiency of this department. You failed to complete an accurate and detailed police report, leaving out material facts. Moreover, you provided unreliable testimony in criminal court, possibly resulting in a Brady issue. Officer Cruz, your failure to properly investigate, document and assist with thorough prosecution in this case clearly exhibits inefficiency and discredits the department."

*Charge 3*

Charge 3 was based on MPDPM Standard of Conduct 323.5.8(l), which reads:

"(l) Any act on- or off-duty that brings discredit to this department."

In its explication of this charge, the Notice stated:

12.

"Your actions in this case, Officer Cruz, has brought discredit to the department. You failed to thoroughly and accurately document this incident as to what truly took place. The police report prepared by you never mentions that the backpack was opened prior to establishing ownership. You also provided false and unreliable testimony, while under oath, in criminal court during the court proceedings for this case."

### *Charge 4*

Charge 4 was based on MPDPM Standard of Conduct 323.5.9(h), which reads:

"(h) Criminal, dishonest, or disgraceful conduct, whether on- or off-duty, that adversely affects the member's relationship with this department."

In its explication of this charge, the Notice stated:

"Your failure to prepare a thorough and accurate police report in this case has adversely affected your relationship with the department. As a Sworn Police Officer with approximately five years of experience, you are entrusted [*sic*] to complete your work thoroughly and accurately as part of his responsibility as an officer. You provided false testimony in criminal court, again adversely affecting his relationship with the department. Moreover, you acted dishonestly in two factors of this criminal investigation, preparing the police report and testifying in criminal court. Officer Cruz, your actions have adversely affected your professional relationship with the Merced Police Department."

### *Charge 5*

Charge 5 was based on MPDPM Standard of Conduct 323.5.2(b), which reads:

"(b) The wrongful or unlawful exercise of authority on the part of any member for malicious purpose, personal gain, willful deceit or any other improper purpose."

In its explication of this charge, the Notice stated:

"Officer Cruz, your actions demonstrates [*sic*] that you maliciously exercised your authority as a sworn peace officer by illegally opening and looking into the backpack before establishing ownership of the bag. By opening and looking into the backpack, before gaining having [*sic*] proper authority, you conducted an illegal search of the backpack. The search violated the 4th Amendment of the U.S. Constitution. During your internal affairs interview, you expressed that you are aware of what the 4th

Amendment of the U.S. Constitution says. The illegal search of the backpack was done with willful deceit or any other improper purpose."

***Charge 6***

Charge 6 was based on Penal Code section 118, subdivision (e), which reads:

"Every person who, having taken an oath that he or she will testify, declare, depose, or certify truly before any competent tribunal, officer, or person, in any of the cases in which the oath may by law of the State of California be administered, willfully and contrary to the oath, states as true any material matter which he or she knows to be false, and every person who testifies, declares, deposes, or certifies under penalty of perjury in any of the cases in which the testimony, declarations, depositions, or certification is permitted by law of the State of California under the penalty of perjury and willfully states as true any material matter which he or she knows to be false, is guilty of perjury. This subdivision is applicable whether the statement, or the testimony, declaration, deposition, or certification is made or subscribed within or without the State of California."

In its explication of this charge, the notice states:

"Before you testified in court about [your] observations and actions … the Court administered an oath to you and you stated that you would testify honestly and truthfully int his matter. You testified before the Court that you did not open the backpack and look inside the backpack prior to asking whom the bag belonged to. You were shown your body camera video, in court, which clearly show [*sic*] you to open the backpack prior to establishing ownership, and you testified that he did not open the backpack prior to establishing ownership. Officer Cruz, you willfully stated that you did not open the backpack prior to establishing ownership, knowing this to be false."

***Charge 7***

Charge 7 was based on Penal Code section 118.1, which reads:

"Every peace officer who files any report with the agency which employs him or her regarding the commission of any crime or any investigation of any crime, if he or she knowingly and intentionally makes any statement regarding any material matter in the report which the officer knows to be false, whether or not the statement is certified or otherwise expressly reported as true, is guilty of filing a false report punishable by imprisonment in the county jail for up to one year, or in the state prison for

14.

one, two, or three years.  This section shall not apply to the contents of any statement which the peace officer attributes in the report to any other person."

In its explication of this charge, the notice states:

> "Officer Cruz, you filed a police report regarding his actions in this criminal investigation.  There was pertinent information left out of the criminal report, which changed the sequence of events.  In your report, you stated that you saw the backpack while performing a safety sweep of the room, asked who the backpack belonged to, Perez advised it was hers and gave consent to search the backpack.  The body camera video clearly shows you opening the backpack, sit it down and later establish ownership."

In a document dated August 7, 2019, the Chief of Police notified Cruz he had been terminated.  Cruz appealed the termination decision to the Board.

**Hearing Before the Board**

The board heard testimony from witnesses, including Cruz, McCoy, and Supervising Deputy District Attorney Matthew Serrato (Serrato).

McCoy testified that defense attorneys can obtain evidence of an officer's past dishonesty in future cases.  McCoy also testified that he relies heavily on the integrity of police report in determining which charges to file and how to prosecute a case.

McCoy said that he was concerned Cruz's claim the zipper was stuck on his glove "may have been a lie."  However, he conceded that he "couldn't tell" based on the video whether Cruz's glove was stuck on the zipper or not.

Cruz testified that, in hindsight, he "could have taken a little more time" on the police report, but at the time he believed he had "done a good job."

When asked why he had previously claimed he "shook" his hand once it became snagged on the zipper, yet the bodycam video showed no shaking, Cruz testified, "It's more a manner of speech, figure of speech.  Shake it off, like I don't let it mentally block me from doing what I was doing, meaning my search."

Serrato said the district attorney's office, for which he worked, maintains a *Brady* list."  "[I]f an officer is deemed to have committed some sort of misconduct that's

15.

discoverable to the defense, we document it, we have it saved under that officer's name in our computer system." If one of the officers on the list testified in a case, the relevant documents about the misconduct are sent to the defense. Serrato sat on a *Brady* committee that made recommendations to the district attorney regarding the *Brady* list.

With respect to the Cruz matter, Serrato reviewed the hearing transcript and the bodycam video. Serrato concluded Cruz's actions did not rise to the level of a *Brady* violation. Serrato felt that "it really kind of evolved into a semantic issue as to whether or not what he did initially constituted a search, and I didn't really feel it did .…"

Serrato also believed that once Cruz "obtain[ed] consent to search the whole bathroom … legally at that point he could – he very easily could have been legally permitted to search through that purse.…"

When asked if his conclusions had changed since he first looked at the case, Serrato said no, but that Cruz's claim about his glove getting caught on the zipper "sounds funny" and "doesn't quite ring true." He followed up, "[B]ut you still can't disprove it."

**Decision of the Board**

In June 2020, the Board issued its findings and recommendations. The Board found that the missing language about the initially opening of the bag did not amount to a false police report. The Board rejected the City's contention that the superior court's ruling that the search was illegal meant it could not be relitigated. They observed that the bodycam video "clearly shows Yolanda Pompa granting consent," and that it was "not clear that the Court would have ruled the search as illegal had it viewed the entire [bodycam] video." However, the Board found that the initial opening of the bag was intentional and Cruz's claim to the contrary was untruthful.

Based on these findings, the Board unanimously concluded the City did not meet its burden of proof in establishing charges 1, 2, 5, 6, 7, and portions of charges 3 and 4.

16.

The Board sustained other portions of charges 3 and 4. The Board recommended that Cruz not be terminated, but instead be demoted to police officer step 5 with no backpay.

On July 14, 2020, the city manager, Steve Carrigan, overturned the Board's decision and upheld Cruz's termination.

On September 15, 2020, Cruz filed a verified petition for writ of administrative mandamus in superior court, challenging his termination. The petition was argued by counsel on June 21, 2021, and the court issued its written order denying the petition on June 17, 2021.[7]

The court concluded that the outcome in the case hinged on two questions:

> "(1) Does the body camera video … constitute substantial evidence that Officer Cruz opened the backpack and looked inside before obtaining consent to search the backpack? This Court finds that it does.

> "(2) Does the Court, exercising its independent judgment, find that the body camera video … establishes that Officer Cruz opened the backpack and looked inside before obtaining consent to search the backpack? This Court finds that it does."

The court further "determine[d] that there was substantial evidence supporting each of the seven charges that the City Manager found to be established by a preponderance of the evidence contained in the Administrative Record, and, exercising its independent judgment, this Court concludes that the evidence establishes each of the seven charges."

In its analysis of charge 5, the court stated,

> "Exercising its independent judgment, this Court finds that the doctrine of collateral estopped [*sic*] precludes relitigation of the criminal court's findings regarding the legality of the search or relitigation of the criminal court's findings as to whether Officer Cruz's testimony presented in the criminal matter was or was not credible."

---

[7] Cruz requests we take judicial notice of the court's tentative ruling on the matter and respondent has made no written objection thereto. We grant the request (see Evid. Code, § 452, subd. (d)), but do not find the tentative ruling material.

The court concluded that the five threshold requirements for collateral estoppel – (1) identity of issues, (2) actual litigation of issue in prior proceeding, (3) issue necessarily decided in prior proceeding, (4) finality of decision on the merits, and (5) privity of party against whom collateral estoppel is sought – were met. With respect to the fifth requirement, the court held "Officer Cruz was in privity with the District Attorney, a party to the action, and the ruling related directly to actions by Officer Cruz in connection with that litigation."

The court continued,

> "Applying this Court's independent judgment, this Court finds that the testimony Officer Cruz provided at the criminal court was not credible and that the doctrine of collateral estoppel precludes Officer Cruz from relitigating whether or not the search was lawful, and, therefore, as a result, that this Court finds that Officer Cruz "maliciously" exercised authority as [a] sworn peace officer by illegally opening and looking into a backpack before establishing ownership of [said] bag, conducted an illegal search, and that the illegal search was done with willful deceit or an improper purpose.…"

The court then discussed the legal principle whereby searches of areas within the wingspan of a probationer may not require any form of consent and cited several cases to that effect. The court observed, "Had this authority been presented by the District Attorney at the suppression hearing in the criminal matter, it is possible that Judge Schechter would have found the search to be lawful." The court then noted that, on the other hand, Judge Schecter found Cruz to lack credibility and that "the fortuitous fact that a probation search might have been lawful does not save a search conducted for other reasons."

Cruz appeals the court's order denying his writ petition.

18.

## DISCUSSION

## I. The Court Prejudicially Erred in Applying Collateral Estoppel to Conclusively Establish the Illegality of Cruz's Search

Cruz's first contention is that the court erred in applying collateral estoppel to preclude relitigation of (1) the legality of the search and (2) his credibility.

Collateral estoppel has five threshold requirements: "1) the issue to be precluded must be identical to that decided in the prior proceeding; 2) the issue must have been actually litigated at that time; 3) the issue must have been necessarily decided; 4) the decision in the prior proceeding must be final and on the merits; and 5) the party against whom preclusion is sought must be in privity with the party to the former proceeding." (*People v. Garcia* (2006) 39 Cal.4th 1070, 1077.)

Privity is "a relationship between the party to be estopped and the unsuccessful party in the prior litigation which is 'sufficiently close' so as to justify application of the doctrine of collateral estoppel [citations]." (*Ceresino v. Fire Ins. Exchange* (1989) 215 Cal.App.3d 814, 820.) The privity requirement is not solely a matter of California law. It is a federal due process violation to hold that a judgment is binding on a litigant who was not a party or a privy to the prior action. (*Parklane Hosiery Co., Inc. v. Shore* (1979) 439 U.S. 322, 327, fn. 7.) Consequently, due process "requires that the nonparty have had an identity or community of interest with … the losing party in the first action." (*Lynch v. Glass* (1975) 44 Cal.App.3d 943, 948.)

### *Privity Did Not Exist Between Cruz and District Attorney*

We conclude privity was not present here. Cruz, who was challenging his termination from city employment in a mandamus action, did not have a community of interest with the district attorney, who was prosecuting two criminal defendants. The present action implicates Cruz's personal interests (i.e., employment), which were not at all "at stake in the suppression hearing." (*Tuttelman v. City of San Jose* (9th Cir. 2011) 420 Fed.Appx. 758, 759 (*Tuttelman*).)

19.

Moreover, Cruz was not "in control of the criminal prosecution." (*Tuttelman*, *supra*, 420 Fed.Appx. at p. 759.) Specifically, he was not in control of which legal arguments would be presented at the suppression hearing to support the legality of the search. That is particularly important here, given the trial court's observation that if authority concerning probationer searches had "been presented by the District Attorney … it is possible that Judge Schechter would have found the search to be lawful."

Because privity did not exist here, the trial court erred in concluding that collateral estoppel applied.

### Harmlessness

The City contends collateral estoppel is "irrelevant" to the trial court's order. Calling the issue "irrelevant" is an overstatement, given that the court's order discussed and applied collateral estoppel. However, the City's explication of its argument suggests that it is actually arguing harmlessness – i.e., that any error with respect to collateral estoppel is harmless because the court also applied its independent judgment to the issue of Cruz's credibility and the legality of his search. We agree with the City on this first point – i.e., that the trial court also found Cruz gave false testimony using its independent judgment. However, we reject the second contention and conclude the court did not apply its independent judgment in determining that Cruz's search was illegal.

### Harmlessness as to Determination of Cruz's Truthfulness

In discussing charge 4, the trial court said,

> "Exercising its independent judgment, this Court finds that the evidence establishes that Officer Cruz opened the backpack and looked inside before obtaining consent to search the backpack … and, as a result, … Officer Cruz provided false testimony in criminal court which adversely affected his relationship with the department, and that Officer Cruz acted dishonestly in … testifying in criminal court, and, therefore, that Charge 4 should be SUSTAINED."

From this text, it is readily apparent that the court applied its independent judgment in concluding Cruz lied about the circumstances of the backpack inspection.

20.

### Prejudice as to Issue of Legality of Search

However, the same cannot be said of the court's consideration of the legality/illegality of Cruz's search. In discussing charge 5, the court said,

> "*Applying this Court's independent judgment*, this Court finds that that the testimony Officer Cruz provided at the criminal court was not credible and *that the doctrine of collateral estoppel precludes Officer Cruz from relitigating whether or not the search was lawful*, and, *therefore, as a result*, that this Court finds that Officer Cruz "maliciously" exercised authority as [a] sworn peace officer by illegally opening and looking into a backpack before establishing ownership of [the] bag, *conducted an illegal search*, and that the illegal search was done with willful deceit or an improper purpose, and, therefore, that Charge 5 should be SUSTAINED."

The court's ruling makes clear that it was using its independent judgment to conclude collateral estoppel applied, not that the search was illegal. This is confirmed by the fact that the subsequent analysis in the trial court's order is primarily a discussion of how Judge Schechter might have ruled differently if she had been presented with legal authority regarding parolee searches.

Consequently, we conclude that while the court conducted an independent application of collateral estoppel, it did not independently determine that the search was illegal. Instead, the court based its decision on the illegality of the search on what we have determined was an erroneous application of collateral estoppel.

Moreover, as explained below, we conclude the search was in fact legal. Therefore, even if the trial court had used its independent judgment to conclude the search was illegal, we would reverse that determination.

Turning to our consideration of the merits, we find the reasoning of *U.S. v. Melgar* (7th Cir. 2000) 227 F.3d 1038 (*Melgar*), persuasive.

*Melgar* involved a motel room with several occupants. Officers asked one of the occupants, Velasquez, to accompany him into the hallway where they asked her for permission to search the room. The officer's "request was a general one; he did not

21.

specifically ask her if the police could search particular closed containers within the room, nor did he ask her which of the numerous people in the room were actually staying there." (*Melgar*, *supra*, 227 F.3d at p. 1039.)  Velasquez granted permission to search the room.  Officers found a floral purse.  They opened it and found the identification of defendant Zoila Melgar and counterfeit checks inside.

Melgar argued the evidence found in the purse needed to be suppressed because "police never obtained permission from anyone to search that particular closed container," and that Velasquez's authority to consent to search did not "extend to closed containers within the room."  Melgar also contended that "the police should have understood that the purse did not necessarily belong to Velasquez because there were several women in the room." (*Melgar*, *supra*, 227 F.3d at p. 1040.)

The appellate court ruled against Melgar.  The court observed, "Generally, consent to search a space includes consent to search containers within that space where a reasonable officer would construe the consent to extend to the container."[8] (*Melgar*, *supra*, 227 F.3d at p. 1041.)

Importantly, the court went on to reject the proposition that police must have positive knowledge that the closed container is under the authority of the person consenting to search.[9]  (*Ibid*.)  "A contrary rule would impose an impossible burden on the police.  It would mean that they could never search closed containers within a

---

[8] The dissent suggests Cruz has pulled one over on us by blurring the distinction between consenting to search the bathroom versus consent to search the backpack.  (Dis. opn., *post*, at p. 13.)  The actual problem is that the dissent overemphasizes the distinction between consenting to search "the bathroom" versus containers within the bathroom, contrary to case law.  As many cases, including *Melgar*, have held, consent to search an area generally includes consent to search the containers within.  We agree with that legal proposition and have applied it here in a rather straightforward manner.

[9] However, when the police do have positive knowledge that the closed container is *not* under the authority of the consenter, then such consent will not suffice.  (See *Melgar*, *supra*, 227 F.3d at pp. 1041–1042, discussing *U.S. v. Rodriguez* (7th Cir. 1989) 888 F.2d 519.)

dwelling (including hotel rooms) without asking the person whose consent is being given *ex ante* about *every* item they *might* encounter." (*Id.* at p. 1042, italics added.)

We agree with *Melgar*. " '[T]he ultimate touchstone of the Fourth Amendment is "reasonableness." ' " (*People v. Ovieda* (2019) 7 Cal.5th 1034, 1041.) It is reasonable for police to presume consent to search a room includes consent to search containers within that room. An officer need not also confirm that each and every container in the room is under the authority of the consenter. *Melgar* properly affirms these principles while also observing that other circumstances, not present here, could alter the analysis (e.g., if the container has a name on it different than the person granting consent).

The City cites to *U.S. v. Whitfield* (D.C. Cir. 1991) 939 F.2d 1071, a case that predates *Melgar*. Relying on *Whitfield*, the City contends Cruz had an obligation to inquire further to resolve the ambiguous ownership situation he was presented with. But *Melgar* was quite clear in rejecting the proposition that police must obtain positive knowledge that a closed container is under the authority of the person consenting to search of the room. (*Melgar*, *supra*, 227 F.3d at p. 1041.) When the person holding themselves out as the resident of the premises consents to a search of the bathroom, and a bag is found therein, a reasonable officer would construe the consent to search extends to the bag.[10] It is not incumbent on the officer to inquire about all the ownership possibilities of each container in a room for which consent to search was given by someone with apparent authority.

The dissent posits that the record in this case – including Cruz's court testimony and his answers during the Internal Affairs investigation and *Skelly*[11] hearing – "definitively establishes" that Cruz did not conduct his search of the backpack in reliance on Pompa's consent to search the bathroom. Not so. Cruz testified at the suppression

_____

[10] Assuming there is no obvious, unambiguous sign of separate ownership, such as a name on the outside of the bag different from the person who had granted consent.
[11] *Skelly v. State Personnel Board* (1975) 15 Cal.3d 194.

23.

hearing that Pompa had consented to search the area Olvera had been in. The People argued at the suppression hearing that "Pompa, who is the resident of the motel room, gave consent to search the bathroom." During the subsequent internal affairs investigation, Cruz said Pompa stated the room was hers along with her boyfriend's, and that she consented to a search. At the *Skelly* hearing, Cruz claimed he had consent to go into the room from a female. Before the personnel board, Cruz "maintained he did not need consent to open the Subject Bag as he had consent from the resident Yolanda Pompa…."[12]

As the record clearly and repeatedly demonstrates, Pompa's consent was a central issue throughout this litigation, not one we plucked from obscurity or came up with on our own.

The dissent goes on to say that the "only way" to find Cruz relied on Pompa's consent is to "reward[] … perjury" and impute reliance in spite of Cruz's denial that he searched the purse. (Dis. opn., *post*, at pp. 12–13.) However, that is not the only way to arrive at our conclusion that the search was constitutional. More importantly, it is not the way we arrived at it. As this opinion makes quite clear, we affirm the trial court's finding that Cruz opened the bag intentionally, not inadvertently. Our analysis proceeds accordingly by determining whether that search was "reasonable" and permissible under applicable constitutional principles.[13]

---

[12] Cruz testified, "But when I asked [Perez for consent], I wasn't expecting [Perez] necessarily to answer because a woman had already given me consent and the bag just seemed out of place. But Ms. Pompa had given me consent."

[13] The dissent says that "[s]ince Cruz affirmatively denies searching the bag before speaking to Perez, one has to ignore his perjury to reach the conclusion the majority reaches here." (Dis. opn., *post*, at p. 13.) The dissent has it backwards. "Ignoring the perjury" would be to accept Cruz's untruthful claim that he did not search the bag initially. Instead, we have operated under the finding of the personnel board and trial court that Cruz did intentionally open the bag initially. Under the legal principles described in *Melgar*, that search was constitutional.

For these reasons, we conclude that even if Cruz searched the bag before speaking with Perez, such a search would not have been illegal. Consequently, charge 5 cannot stand.

## II. The Charges Pertaining to Cruz's Police Report Were Unsupported

Cruz contends that there is insufficient evidence he omitted material facts in his police report. We agree.

The City alleged Cruz omitted material facts from the police report. This omission was the basis, in whole or part, for several charges against Cruz. Specifically, the City asserted that the omission (1) violated a police department policy prohibiting the "[f]ailure to disclose or misrepresenting [of] material facts, or making any false or misleading statement on any … report … during the course of any work-related investigation" (charge 1); (2) violated a police department policy against "disparaging remarks or conduct concerning duly constituted authority to the extent that such conduct disrupts the efficiency of [the] department or subverts the good order, efficiency and discipline of [the] department or that would tend to discredit any of its members" (charge 2); (3) violated a police department policy against acts that "bring discredit to [the] department" (charge 3); (4) violated a police department policy against "criminal, dishonest, or disgraceful conduct, whether on- or off-duty, that adversely affects the member's relationship with [the] department" (charge 4); and (5) violated a penal code statute (Pen. Code, § 118.1) prohibiting the filing of a false police report (charge 7).[14]

By requiring only disclosure of those facts that are "material," the department policy does not mandate that police reports detail every square inch searched by an officer during an incident. Neither must a police report describe every door that was

---

To the extent the dissent concludes constitutional law is inapplicable to this case (dis. opn., *post*, at p. 13), we disagree.

[14] Charge 6, and portions of charges 2 through 4, were based on the testimony Cruz gave in court.

25.

opened or every container that was inspected. Instead, only those aspects of the search that are "material" need to be included. Cruz's final, search of the bag that yielded the gun was certainly material, and it was included in the report. But the first opening of the bag, even if it was intentional, was not material. It was not an illegal search, and it yielded no contraband. Consequently, even the version of events accepted by the trial court – that Cruz intentionally opened the zipper of the bag and looked inside for a few seconds – was not material.[15]

Nor was anything in the report untruthful or misleading. Indeed, the allegations to the contrary are just rehashes of the claim that the report should have mentioned the initial opening of the backpack. The City contended the report was misleading because it stated that Cruz asked who the bag belonged to, Ms. Perez consented to a search, Cruz searched the bag and found a gun inside. But that is all true, and chronologically correct. It does omit the initial opening of the zipper but, as discussed above, that omission was not improper.[16]

## III. Substantial Evidence Supported Trial Court's Determination that Cruz's Court Testimony was Untruthful

Cruz also mounts a substantial evidence challenge to the trial court's determination that Cruz's testimony was untruthful. We review the trial court's determination under the substantial evidence test. (*Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 824.) Under that standard, we resolve all conflicts in evidence in favor of the prevailing party and indulge all legitimate inferences to uphold the judgment, if possible. (*Ricasa v. Office of Administrative Hearings* (2018) 31 Cal.App.5th 262, 276.)

---

[15] In resisting this conclusion, the City focuses on Cruz's subjective intent/beliefs about the scope of his authority to search. But an immaterial fact would not become material simply because an officer mistakenly thought it was material.

[16] That said, we presume it is better to err on the side of over-inclusion of facts in a police report, rather than under-inclusion. With the benefit of hindsight, perhaps it would have been simpler if Cruz had included the circumstances of the initial zipper opening in the report. Nonetheless, those facts were not "material."

*Analysis*

Cruz testified that he did not unzip the bag when he placed it on the sink. After being shown the video, Cruz testified he did unzip the bag when he placed it on the sink because of "[t]he way in which I grabbed it."

The Board found that Cruz's unzipping of the bag was intentional, and not inadvertent. Therefore, the Board found Cruz's claim that the opening was inadvertent to be untruthful.

The trial court found that, "Cruz opened the backpack and looked inside before obtaining consent." While it is true, as Cruz argues, that this sentence technically does not speak to intentionality, we think context makes clear the court found Cruz opened the bag intentionally. The court found that Cruz "opened the backpack and looked inside," yet did not disclose that fact in his court testimony. However, Cruz did testify as to opening the backpack in court, but claimed it occurred inadvertently (i.e., because of "the way in which [he] grabbed it"). So, the only way the trial court could say Cruz did not disclose that he "opened" the backpack would be if the court meant "intentionally opened." Therefore, we understand the trial court to have found, like the Board, that Cruz intentionally opened the backpack.

Turning to the evidence, we conclude this finding was adequately supported. The bodycam video shows Cruz grabbing the backpack with his left hand approximately four seconds before a zipper sound is heard. The "opening" zipper noise is concurrent with movement of Cruz's right hand, which is a "smooth" movement. The next zipper noise is not heard for another five seconds, approximately. During that five seconds, sounds consistent with items being moved around in the bag are heard and Cruz's gaze is facing downward. From these circumstances, one eminently reasonable inference is that Cruz intentionally opened the bag, looked briefly through its contents, and intentionally closed it.

27.

While we cannot say the video conclusively negates any possibility of an accidental opening, we can certainly say that an accidental opening is not the only inference raised by the video. A factfinder might assume that if the bag had been accidentally opened by Cruz, it would have been immediately closed or that Cruz would have at least reacted in a manner suggesting surprise. Instead, the bag is apparently left open for five seconds, during which time sounds consistent with rifling through the bag's contents are heard. There is no obvious explanation for why the bag would be left open for some five seconds if its opening was inadvertent. Also, during that five seconds, Cruz is looking downward, makes no visible motions (e.g., shaking) consistent with attempting to dislodge from the bag, and he makes no visible facial expressions of surprise or confusion. While these factors seem inconsistent with an accidental opening, they are not absolutely determinative.

In sum, disbelief of Cruz's testimony was not the only basis for finding against him, as the bodycam video itself raises an inference that Cruz intentionally opened the bag.

More importantly, even if the video supported an inference of accidental opening, that fact would not be dispositive on substantial evidence review. Cruz argues that people viewing the bodycam footage could come to different conclusions regarding what happened. But even assuming that is true, our deferential standard of review would require we would uphold the trial court's finding. " ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment." ' " (*In re George T.* (2004) 33 Cal.4th 620, 631.) In other words, all that matters is that the trial court's finding was supported by substantial evidence; it does not matter that Cruz's position may also have been supported by substantial evidence.

In sum, we uphold the court's apparent finding that Cruz intentionally opened the bag and that Cruz's testimony that the bag opened inadvertently as a result of how he grabbed the straps was untruthful. Accordingly, we will uphold the portion of the court's order sustaining charge 6, as well as the aspects of charges 2 through 4 that were based on Cruz's court testimony.

**Conclusion**

As explained throughout this opinion, we have concluded the trial court erred in relying on certain charges to sustain Cruz's termination. While we have also upheld some of the charges against Cruz, we cannot affirm the judgment because the possibility remains that the trial court could conclude, in its independent judgment, that the surviving charges are insufficient to support Cruz's termination (i.e., that the termination decision was an abuse of discretion). (See *Fukuda v. City of Angels*, *supra*, 20 Cal.4th at pp. 824–825.) We will therefore remand for the trial court to make that independent judgment in light of this opinion.[17] (See *ibid*.)

**DISPOSITION**

The trial court's order is reversed and this matter remanded to the trial court for further proceedings consistent with this opinion.

POOCHIGIAN, Acting P. J.

I CONCUR:

DETJEN, J.

---

[17] While we find the Board's recommendation of demotion without backpay to be reasonable, the determination of whether termination was an abuse of discretion should be made by the trial court in the first instance.

29.

SMITH, J., Dissenting.

I respectfully dissent from parts of the majority opinion. I disagree with the majority's conclusion that Cruz prepared a thorough and complete police report regarding the incident at issue here. I also disagree with the majority's determination that the searches at issue here were constitutional. I agree with the majority's conclusion that the trial court properly found that Cruz committed perjury at the suppression hearing. And, finally, I disagree with the remand of the matter to the trial court for it to review the penalty of termination that was imposed by the Merced city manager in this case. I address all these points below.

## I.      Standard of Review

Preliminarily, it is necessary to outline the applicable standard of review to guide analysis of the issues presented in this administrative mandamus matter. The legal framework applicable to review of administrative mandamus proceedings is relatively complex and exacting. The majority opinion does not fully address or comport with the legal framework that governs our review of this matter.

While the trial court was required to independently review the evidence, the standard of review on appeal from the trial court's determination is the substantial evidence test. (*Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 824.) That is, we must "sustain the trial court's findings if they are supported by substantial evidence." (*Governing Board v. Haar* (1994) 28 Cal.App.4th 369, 378; *Bixby v. Pierno* (1971) 4 Cal.3d 130, 143, fn. 10 ["After the trial court has exercised its independent judgment upon the weight of the evidence, an appellate court need only review the record to determine whether the trial court's findings are supported by substantial evidence."].) Substantial evidence is "relevant evidence that a reasonable mind might accept as adequate support for a conclusion" (*Taylor Bus Service, Inc. v. San Diego Bd. of Education* (1987) 195 Cal.App.3d 1331, 1340-1341), or evidence of " ' "ponderable legal

significance … reasonable in nature, credible, and of solid value." ' " (*Ofsevit v. Trustees of Cal. State University & Colleges* (1978) 21 Cal.3d 763, 773, fn. 9.)

We review questions of law de novo. (*Bostean v. Los Angeles Unified School Dist.* (1998) 63 Cal.App.4th 95, 107-108; *Christensen v. Lightbourne* (2017) 15 Cal.App.5th 1239, 1251 [on questions of law arising in mandate proceedings, courts exercise independent judgment, with the superior court and appellate court performing the same functions]; *Pedro v. City of Los Angeles* (2014) 229 Cal.App.4th 87, 99 ["An appellate court independently determines whether the agency [or entity] prejudicially abused its discretion by failing to proceed in the manner required by law, such as by failing to comply with required procedures, applying an incorrect legal standard, or committing some other error of law."].)

## II.     Trial Court Properly Found Cruz Committed Perjury in Criminal Court

As noted in the majority opinion, Cruz conducted a search of the bathroom of Room 27 at the Gateway Motel. Cruz's bodycam captured the incident on video. During the search, Cruz saw a small, flowered backpack-style purse in the bathroom. Eventually, he found a handgun in the purse. Anabelle Perez, the owner of the purse, and Martin Olvera were prosecuted in connection with the handgun.

Perez filed a motion to suppress the handgun. Cruz's bodycam video was played at the suppression hearing. After the video was played, Cruz testified under oath that when he first dealt with the flowered purse in the bathroom, he inadvertently opened it because of "[t]he way in which [he] grabbed it." The criminal court found that Cruz's "odd explanation about the way he gripped [the purse], the zipper was open and of course it opened more," was "[not] at all credible," and did not comport with the video evidence of the initial opening of the purse. Although the handgun was discovered in a subsequent search of the purse pursuant to consent from Perez, the court granted the suppression motion on grounds the initial opening was an unconstitutional search that tainted the

2

second search. The prosecutor dismissed the charges against Perez and Olvera without appealing the court's ruling on the suppression motion because of "the credibility issue."

The Merced Police Department opened an internal affairs (IA) investigation. Cruz's description of what happened when he first dealt with the purse, changed at this stage. The IA investigator recounted Cruz stated in his interview that when he initially picked up the purse, "he felt a snag and the bag unzipped," such that Cruz "figured it was his glove or sleeve that got caught" and inadvertently opened the bag. Cruz explained in the IA interview: "I shook off my hand and got whatever was caught in there which I believe was my glove." The IA investigator reviewed the bodycam video of the incident and determined Cruz's explanation was inconsistent with the video. The IA investigator concluded Cruz had lied under oath at the suppression hearing in describing the initial opening of the purse as inadvertent rather than intentional.

Cruz then met with the Merced police chief for a pre-disciplinary meeting. The police chief later recounted that Cruz repeated that, in initially dealing with the bag, he "snagged either [his] glove or [his] sleeve and unzipped the zipper opening the bag." The police chief took note that this explanation was different from Cruz's sworn testimony at the suppression hearing that the bag unzipped initially because of the way he grabbed it. The police chief concluded, based on the bodycam video of the incident, that Cruz's explanations that the bag opened inadvertently the first time, were "not credible."

The City of Merced's Personnel Board thereafter held a hearing on the matter. At the Personnel Board hearing Cruz was asked about the fact the bodycam video did not show him shaking off his hand as he had described to the IA investigator. Cruz responded: "It's more of a manner of speech, figure of speech. Shake it off, like I don't let it mentally block me from doing what I was doing, meaning my search." The Personnel Board found "[Cruz's] explanation regarding the glove/sleeve getting caught and causing the bag to open inadvertently was not credible." The Board concluded: "All

3

three Board Members find [Cruz's] explanation about the manner in which the Subject Bag was opened before permission was granted[,] to be untruthful. The video clearly showed that [Cruz] opened the bag before he had permission to do so from Anabelle Perez."

The Merced city manager then reviewed the matter. The city manager came to the same conclusion, that is that Cruz had committed perjury at the suppression hearing in describing the initial opening of the bag.

Finally, the trial court in the present proceeding similarly determined that "Officer Cruz opened the backpack and looked inside before obtaining consent to search the backpack … and, as result … Officer Cruz provided false testimony in criminal court … and … acted dishonestly in … testifying in criminal court."

In sum, every factfinder involved at each stage of this matter below, concluded that Cruz committed perjury in describing the initial opening of the bag at the suppression hearing. The criminal court, the Merced Police Department, the Personnel Board, the city manager, and the trial court, all concluded Cruz perjured himself at the suppression hearing by characterizing the initial opening of the bag as inadvertent rather than intentional. The trial court sustained Charges 1 through 4 and Charge 7 based, in part, on its finding that Cruz committed perjury in describing the initial opening of the backpack at the suppression hearing.

This court has now upheld the trial court's perjury finding on appeal, a conclusion with which I agree. The bodycam video of the incident as well as Cruz's shifting explanations regarding the initial opening of the bag, constitute substantial evidence supporting the trial court's perjury finding.

4

**III. Cruz Did Not Accurately Document, in His Police Report, the Sequence of Events That Occurred During the Bathroom Search**

Cruz prepared a police report documenting and memorializing the search of the motel room bathroom that yielded the handgun and resulted in criminal prosecutions of Anabelle Perez and Martin Olvera. Cruz wrote in the police report that when he arrived at the motel room, he saw three men and three women inside: Richard Maya, Martin Olvera, a man called Christian, Anabelle Perez, Yolanda Pompa, and a woman called Amber. Cruz documented that, prior to searching the motel room bathroom, he determined that Richard Maya was the renter of the room. Cruz did not note the relationship of any of the other occupants to Richard Maya. Rather, he documented that he proceeded to search the bathroom pursuant to consent from Maya, the known renter of the motel room.

Cruz noted in his police report that, "[i]n performing a safety sweep" of the bathroom, he saw "a smaller white-with-flowery-print backpack," that was "affixed with zippers from topside to its sides and one zipper to the front." Cruz wrote: "I asked who the backpack belonged to, and Perez advised it was hers. Perez consented to a search of her backpack." (Unnecessary capitalization omitted.) Cruz continued: "In checking the backpack, I could tell there were women's hygiene items within it as well as other sets of sunglasses and small cards. One of the cards was, in fact, Perez's California identification card. Also within the bag was what appeared to be a blouse with its store tags attached and a bra. Beneath those items was a small spray perfume bottle and what was obviously a handgun."

In Cruz's telling, as documented in the police report, Cruz performed a textbook search, the constitutionality of which was above reproach. He determined the renter of the motel room was Richard Maya. He entered the motel room's bathroom pursuant to Maya's consent. In "performing a safety sweep," he saw a feminine "white-with-flowery-print backpack." Recognizing it was a woman's bag, Cruz did not rely on

5

Maya's consent in opening it; rather, he asked the occupants, to whom did the backpack belong. Annabelle Perez said it was hers, so Cruz obtained Perez's consent to search the backpack. When he opened the backpack with Perez's consent, he saw Perez's California identification card on top, confirming the backpack belonged to Perez. As Cruz looked deeper in the bag, underneath a blouse and bra, he found a handgun.

Unfortunately for Cruz, his body camera recorded the entire incident. The video revealed the initial opening of the purse, which had been entirely omitted from the police report, thereby raising colorable questions as to the constitutionality of the search that yielded the handgun. Other discrepancies between the video and the police report also came to light. For example, the Merced police chief disputed Cruz's characterization in the police report that he noticed the flowered backpack while "performing a safety sweep." The police chief observed the bodycam video showed Cruz searched the "the whole area," which is "different from [conducting] a safety sweep." The police chief also questioned Cruz's failure to document the initial opening of the backpack, which the police chief described, based on the bodycam video, as follows: "In the video and the reflection in the mirror you are looking down and moving your hand consistent with someone looking through the bag and you can actually hear what is consistent with moving something around. Your head is moving and I can see your body move." The police chief expected Cruz to document these facts in his police report.

Some of the charges against Cruz, as adjudicated at the administrative hearing, pertained to Cruz's failure to document the true facts of the initial search in his police report. For example, Charge 3 alleged a violation of Merced Police Department Policy 323.5.8, specifically that Cruz "failed to thoroughly and accurately document what truly took place (Police Report): no mention of opening backpack prior to establishing ownership." As to this charge, the trial court made a *factual finding* as follows: "Exercising its independent judgment, this Court finds that the evidence establishes that

6

Officer Cruz opened the backpack and looked inside before obtaining consent to search the backpack, that Officer [Cruz] did not disclose that this occurred in his police report and testimony, and, as a result, Officer Cruz failed to thoroughly and accurately document what actually took place, and that Officer Cruz provided false and unreliable testimony under oath in court, and, therefore, that Charge 3 should be sustained." (Unnecessary capitalization omitted.)

Next, Charge 4 alleged, in part, a violation of Merced Police Department Policy 323.5.9(h), specifically that Cruz "[a]cted dishonestly in preparing the Police Report," and his "failure to prepare a thorough and accurate Police Report affected his relationship with the department." As to this charge, the trial court made a *factual finding* as follows: "Exercising its independent judgment, this Court finds that the evidence establishes that Officer Cruz opened the backpack and looked inside before obtaining consent to search the backpack, that Officer Cruz did not disclose that this occurred in his police report and testimony, and, as a result, Officer Cruz failed to prepare a thorough and accurate police report that affected his relationship with the department, Officer Cruz provided false testimony in criminal court which adversely affected his relationship with the department, and that Officer Cruz acted dishonestly in preparing the Police Report and testifying in criminal court, and, therefore, that Charge 4 should be sustained." (Unnecessary capitalization omitted.)

As noted above, our review of the trial court's factual findings is strictly circumscribed: we review the trial court's factual findings for substantial evidence. (*Barber v. Long Beach Civil Service Com.* (1996) 45 Cal.App.4th 652, 659 [in determining whether substantial evidence supports the trial court's conclusions, "we must resolve all conflicts and indulge all reasonable inferences in favor of the party who prevailed in the trial court"]; *San Diego Unified School Dist. v. Commission on Professional Competence* (2011) 194 Cal.App.4th 1454, 1461-1462 [" ' " 'When more

7

than one inference can be reasonably deduced from the facts, the appellate court cannot substitute its deductions for those of the superior court.' " ' "].)

Here, the trial court made factual findings that Cruz did not accurately document the true facts of the initial search in his police report and these findings are amply supported by substantial evidence. The facts of the initial search are recorded in the bodycam video. The trial court exercised its independent judgment on the evidence, including the bodycam video, and found that when Cruz initially dealt with the backpack, he intentionally opened and looked in it. It is undisputed that Cruz did not document these facts—the true facts of the initial search as determined by the trial court—in his police report. This record compels affirmance of the trial court's findings underlying Charges 3 and 4, to the effect that Cruz did not prepare a thorough and accurate police report.

The majority asserts Cruz was not required to document, in his police report, the facts of the initial search—a search Cruz falsely testified did not even happen—because that initial "search" was properly conducted and was constitutional. However, the question before us is whether the court's findings are supported by substantial evidence, which they undoubtedly are. The majority believes the determinative criterion for assessing whether Cruz prepared a thorough and accurate police report is the constitutionality or unconstitutionality of the initial search of the backpack. The majority places the cart before the horse. The constitutionality of any search can only be determined if the facts related to the search are known in the first instance.

The legality of the instant searches was not a foregone conclusion. Anabelle Perez had the right to litigate the issue in her criminal case. The constitutionality of the searches at issue cannot be tested or established if the searches are not documented in the police report. If the fact that a search occurred is omitted from a police report, how can colorable legal issues be detected, litigated, and decided in the first place? The

8

conclusion by a split appellate panel, after protracted administrative and legal proceedings spanning a number of years, that the initial search—a search Cruz vehemently denies conducting—was somehow valid under the Constitution of the United States does not mean that Cruz properly omitted mention of the underlying facts from his police report.

Had Cruz's police report—which misleadingly presented the bathroom search as a textbook one—been the only factual record documenting how the search unfolded, the present litigation concerning the constitutionality of the search(es) would not have occurred. Not only did Cruz omit the facts related to the initial search from his police report, but he doubled down and testified, falsely, that *there was no initial search*. Cruz lied to cover up the original omission in his police report, which omission was revealed by the bodycam video. He sought to minimize the significance of the omitted facts.[1] Without the bodycam video, we would never have known about the initial search, and the question of its constitutionality or unconstitutionality would not have arisen in the first place. Hence, the picture documented in the police report was incomplete and inaccurate in material respects.

The bodycam video led the criminal court to find Cruz had perjured himself and to hold his searches unconstitutional. Had the bodycam video not existed, the entire arc of the present litigation would have been precluded. Even if the litigation somehow happened, without the bodycam video, Cruz's perjury and the facts surrounding the initial search would have remained obscured and we would not be here today. The record, and the course of events that unfolded only because of the bodycam video, show that the omission of the initial search from the police report was a highly material omission (and not least in Cruz's own mind).

---

[1] As the IA investigator explained: "[Cruz] got caught and had to come up with a reason to try and explain getting caught."

9

The trial court made factual findings that upheld all the charges predicated on Cruz's failure to document the initial search in his police report, namely Charges 1 through 4 and Charge 7. The trial court's findings underlying these charges are supported by substantial evidence and should therefore be affirmed on appeal. (See *Breslin v. City and County of San Francisco* (2007) 146 Cal.App.4th 1064, 1078 ["Applying the substantial evidence test on appeal, we may not reweigh the evidence, but consider that evidence in the light most favorable to the trial court, indulging in every reasonable inference in favor of the trial court's findings and resolving all conflicts in its favor."].)

## IV.  The Search That Yielded the Handgun Was Unconstitutional

The majority relies on *United States v. Melgar* (7th Cir. 2000) 227 F.3d 1038 (*Melgar*) in finding that the initial search was constitutional and it therefore did not taint the subsequent search that yielded the handgun. But *Melgar* is distinguishable and the facts of *Melgar* differ in critical respects from the facts of this case. In *Melgar*, a number of people were present in a hotel room. The police searched the room based on the consent of the renter of the room, a woman (the police were previously aware the woman was the renter of the room). As the renter of the room, she had actual authority to consent to the search of the room. The renter and the other occupants were then taken to the police station. During the subsequent search of the hotel room, the police found a flowered purse under the mattress. The police searched the purse and found contraband in it. Identification in the purse showed it belonged to one of the room's occupants, not to the renter of the room.

In *Melgar*, the search of the purse was valid because (1) police had consent to search the hotel room from the renter of the room, (2) the renter of the room was a woman, (3) the purse was a woman's purse, (4) police reasonably construed the renter's consent to extend to the purse in her room, and (5) police relied on the female renter's

10

consent in searching the purse. (*Melgar*, *supra*, 227 F.3d at pp. 1039-1040, 1042.) Moreover, in *Melgar*, none of the occupants were present in the hotel room when police found the purse (all the occupants had already been taken to the police station), so police had no way to try to ascertain to whom the purse in question belonged. (*Id.* at p. 1040.)

Here, as recorded at the beginning of the bodycam video, Cruz knew Richard Maya (a man) was the renter of the motel room before Cruz entered the room. Cruz documented in his police report that he searched the bathroom pursuant to consent from the renter of the motel room, Maya. While Cruz mentioned Yolanda Pompa in his police report, he did not document her relationship to Maya or the motel room in question or specify that she had granted consent to search either the bathroom or the backpack. The trial court in the present administrative proceeding did not make any factual findings as to Pompa's relationship to Maya or to the motel room, or on the issue whether Pompa had granted any form of consent to Cruz. The majority, however, contends, citing *Melgar*, that Pompa had apparent authority to grant consent to a search of the bathroom and Cruz reasonably relied on Pompa's apparent authority to grant such consent in searching Anabelle Perez's purse. I disagree with the majority's conclusion. Not only are we not free to weigh the evidence to make factual findings on appeal, but *Melgar* does not encompass the situation we have here, where the police officer conducting the search perjured himself in describing the search.

In *Melgar*, the police had consent from the renter of the hotel room to search the room AND actually relied on that consent to search the purse found under the mattress in that room. Here, even assuming Cruz could properly search the *bathroom* based on Pompa's putative general consent to a bathroom search, Cruz, by his own admission, did NOT rely on that consent in searching the *backpack*. This is a critical difference between *Melgar* and the present case: here, there is no evidence that Cruz *searched the backpack* pursuant to any putative consent from Pompa to a bathroom search.

11

Cruz repeatedly testified under oath that he initially opened the backpack *inadvertently*, giving different descriptions at the suppression hearing and administrative hearing, respectively. In addition, during the IA investigation, Cruz reenacted, on video, the initial opening of the backpack. In the video, Cruz stated he initially picked up the backpack not to search it, but rather to check whether there were any identifying marks on it, so he could identify its owner. In doing so, he snagged his glove in the zipper and accidently opened the backpack. During his *Skelly*[2] hearing, Cruz reiterated he intended to look for identifying marks on the backpack when he snagged his glove in the zipper and inadvertently opened it. Cruz was left "dumbfounded," and looked down at the bag because he "was tryin[g] to figure out how [he] got that unzipped without intentionally wanting to unzip it." Thereafter, Cruz specifically asked whose backpack it was, in an effort to identify its owner; after Anabelle Perez claimed it, Cruz searched the backpack and found Anabelle Perez's California ID card among the items at the top of the backpack. This record definitively establishes, as a matter of law, that Cruz did not conduct the initial search of the *backpack* in reliance on Pompa's general consent to a search of the *bathroom*.

The majority disagrees with the proposition the record "definitively establishes" that Cruz did not conduct the initial search of the *backpack* in reliance on Pompa's general consent to a search of the *bathroom*. But the majority merely parses the record to show Pompa consented to a generalized search of the *bathroom* and Cruz relied on this general consent to search the *bathroom*. My (more nuanced) point is that the record definitively establishes that Cruz did not initially search the *backpack* in reliance on Pompa's putative consent to a *bathroom search*. Put simply, since Cruz has insisted to this day that he did not intentionally open the backpack the first time, he obviously

---

[2] *Skelly v. State Personnel Bd.* (1975) 15 Cal.3d 194.

12

cannot contend he opened it in reliance on Pompa's (*or anyone else's*) generalized consent to a bathroom search. Cruz deploys the self-serving ploy of blurring the distinction between the bathroom search and the initial search of the backpack, and the majority buys into this ploy. But the determinative issue here is Cruz's perjured testimony. Cruz's perjured testimony that the initial search did not occur in the first place takes this case outside of the application of constitutional law altogether. (*United States v. Agurs* (1976) 427 U.S. 97, 104 [perjury "involve[s] a corruption of the truth-seeking function of the trial process"].)

The only way to find Cruz relied on Pompa's generalized consent to a *bathroom* search, to open and search the *backpack* the first time, is by ignoring or, more correctly, rewarding Cruz's perjury and affirmatively imputing such reliance despite Cruz's denials that he searched the purse at that juncture. That is a bridge this court need not, and should not, cross. I conclude there was no justification for Cruz to open the backpack the first time, prior to obtaining consent from Anabelle Perez to do so. It follows the initial search was unconstitutional and tainted the subsequent, consensual search that yielded the handgun. The handgun was therefore properly suppressed in the criminal proceedings.

In finding to the contrary, the majority states: "[W]e conclude that even if Cruz searched the bag before speaking with Perez, such a search would not have been illegal." (Maj. opn., *ante*, at p. 25.) The majority's conclusion might have made sense if Cruz had testified that, before speaking with Perez, he searched the bag knowing he had Yolanda Pompa's consent to search the bathroom. Since Cruz affirmatively denies searching the bag before speaking to Perez, one has to ignore his perjury to reach the conclusion the majority reaches here. The majority insists it has taken Cruz's perjury into account by viewing Cruz's initial opening of the backpack as a search per the trial court's perjury finding. However, there is still the problem that the trial court did not find that Cruz searched the *backpack* based on Pompa's consent to a *bathroom* search. Indeed, because

13

of Cruz's perjury, the record affirmatively precludes a finding that Cruz construed Pompa's generalized consent to a bathroom search to extend to the backpack and relied thereon in intentionally opening the backpack and searching it. The majority's constitutional analysis falls apart because it does not account for the essential, but missing, element of reliance.

To the extent the trial court applied collateral estoppel to find the search of the backpack was unconstitutional (in light of the criminal court's conclusion to this effect), that issue is irrelevant. We can determine, de novo, the legality of the search as a pure question of law or mixed question of law and fact, based on Cruz's police report, Cruz's sworn testimony at the suppression hearing, Cruz's statements in the IA investigation, Cruz's sworn testimony at the administrative hearing, and the trial court's factual findings in the instant administrative proceeding. As explained above, based on this evidence and the findings below, the initial search of the backpack was illegal and the illegality tainted the subsequent search that yielded the handgun.[3] The trial court sustained Charge 5, based on its conclusion that Cruz's searches of the backpack were unconstitutional. Upon de novo review, relying on facts that appear in the record, I would affirm the trial court's sustainment of Charge 5.

## V.     The Penalty of Termination Was Proper as a Matter of Law

Cruz argues the Merced city manager's decision to terminate his employment was "arbitrary, capricious and a patently abusive exercise of discretion." However, the penalty imposed by the city manager is proper as a matter of law.

---

[3] To the extent the majority reviews the constitutionality of the searches at issue de novo, it cannot act as a factfinder in ascertaining the facts underlying its determination, by resolving conflicts in the evidence or weighing the evidence, or by supplying facts that do not appear in the evidence. The majority arrives at its conclusion that the searches were constitutional via a highly abstract analysis that does not identify the facts or evidence upon which it relies.

14

"[T]he penalty imposed by the administrative body will not be disturbed in the mandate proceeding unless a manifest abuse of discretion is shown." (*Deegan v. City of Mountain View* (1999) 72 Cal.App.4th 37, 46.) "The appellate court uses the same standard as the superior court, reviewing the agency's penalty for manifest abuse of discretion." (*Id.* at p. 47.) Furthermore, "[t]he appellate court conducts a de novo review of the penalty assessed, giving no deference to the trial court's determination." (*Id.* at p. 46.) "If reasonable minds may differ as to the propriety of the penalty imposed, there has been no abuse of discretion." (*Id.* at pp. 46-47.) "It is only in the exceptional case, when it is shown that reasonable minds cannot differ on the propriety of the penalty, that an abuse of discretion is shown." (*Id.* at p. 47.) "We do not substitute our discretion for that of the administrative agency on the degree of punishment to be imposed." (*Ibid.* [" ' "Neither an appellate court nor a trial court is free to substitute its discretion for that of the administrative agency concerning the degree of punishment imposed." ' "].)

Cruz has been found by numerous tribunals to have committed perjury in a criminal court, which finding has now been upheld in this court. This is an extremely serious finding for anyone, for a police officer it is career ending. At the administrative hearing below, counsel for the City of Merced observed in his opening statement: "Ultimately this is a case about honesty, integrity and trust, the trust between a police officer and a district attorney, the trust between a police officer and a sitting judge, the trust between a police officer and his superiors in the police department and ultimately the trust between the Merced Police Department and the City of Merced, the community which it represents and protects."

Deputy District Attorney Tyson McCoy testified at the administrative hearing. McCoy was asked to "explain the significance of the trustworthiness or honesty of a police officer when a police officer is on the witness stand." McCoy responded: "It's everything. It's everything. If a police officer can't be trusted, the system falls apart, and

15

much as I hate being here to see an officer go through this, and I'll be honest with you, our system only works if people are honest, and the fact that I believe an officer may have lied on the stand, I was very concerned. I was very concerned that his credibility was now at issue. I don't know if he could be trusted on other cases." McCoy noted that acts of dishonesty and moral turpitude would stick with an officer for his entire career. McCoy explained: "If there was evidence that a witness had lied, including an officer, yes, we would discover that on every case that witness testifies in." McCoy added that in many criminal cases, an officer's word is "central," and turning over evidence of prior perjury by the officer "usually will tank the case." McCoy concluded: "One thing I think people in the public don't really understand until you've worked in this business is that we strive really hard to do what's right from the DA's side, and we strive really hard to present things in the honest, truthful light in every way we can."

Merced Police Captain Jay Struble, who conducted the IA investigation in this matter, also testified at the administrative hearing. Struble highlighted the gravity of a police officer committing perjury in a criminal case. Struble testified: "If you are not honest and do not testify truthfully in this career, there's a thing called the *Brady* issue.[4] *Brady* is a whole 'nother case law, but basically if you're found to be dishonest, the district attorneys very rarely can even use you to prosecute criminal cases. [¶] … [¶] I mean unfortunately that's where this case went. It was basically a case of being dishonest. There was plenty of opportunity out there and given to Officer Cruz to correct it. [¶] … [¶] So based on the dishonesty, I had no choice. I cannot have an officer that's dishonest working for the Merced Police Department."

Struble emphasized: "If you're not truthful, you cannot be in law enforcement, whether it's in Merced, Sacramento, L.A., Florida. You cannot be dishonest." Struble

---

**4** *Brady v. Maryland* (1963) 373 U.S. 83.

16

further noted: "When you're dishonest in court and you don't provide truthful testimony, there really is – you can't progressively discipline based on the fact that everyone – all the public defenders and defense counsel in this county is going to know, oh, this person – this officer lied on the stand and they're going to do – I hate to get off – Pitchess motions and various other things, and your district attorney's office is not going to be able to use an officer to prosecute criminal cases. [¶] So it does me no good to have an officer out working the street, arresting people if we can't get them prosecuted."

The Merced city manager noted: "I have taken weeks to review this case thoroughly and after weighing all of the information, there are two words that I can hear in my head, 'honesty and credibility….' Without honesty and credibility, who are we as a city or as a society? These two words bind us together and define who we are and somewhere in this matter involving Officer Cruz these two words got lost."

Finally, the trial court below observed: "A Police Department should not be required to employ an officer whose credibility will be an issue in every case in which he testifies." The trial court concluded that "the decision of the City Manager to uphold the termination of Officer Cruz's employment was not an abuse of discretion." This court applies the same standard as the trial court in reviewing the propriety of the Merced city manager's penalty determination in this administrative proceeding. Furthermore, this court independently assesses the penalty imposed by the agency, giving no deference to the trial court's determination. Accordingly, at this juncture, it is unnecessary to remand the matter for the trial court to review the Merced city manager's original penalty determination. The majority provides no explanation for the remand in light of the fact the trial court's determination is not accorded deference.

This court has affirmed the trial court's determination that Cruz lied under oath in criminal court. Moreover, it is indisputable that honesty, integrity, and credibility are paramount attributes for police officers. (See *Crawford v. City of Los Angeles* (2009) 175

17

Cal.App.4th 249, 257 ["Termination based upon a false statement by a peace officer is indisputably within the City's power."]; *Ackerman v. State Personnel Bd*. (1983) 145 Cal.App.3d 395, 400 ["the credibility and honesty of an officer are the essence of the function"]; *Kolender v. San Diego County Civil Service Com*. (2005) 132 Cal.App.4th 716, 721 [" 'A [police officer's] job is a position of trust and the public has a right to the highest standard of behavior from those they invest with the power and authority of a law enforcement officer.' "].)  In addition, the record establishes that the agency does not apply progressive discipline when a police officer is found to have been dishonest. Therefore, the penalty of termination imposed here is proper as a matter of law for Cruz's commission of perjury in criminal court.  The majority's observation that "demotion without backpay" is a "reasonable" penalty is not supported by the record.  (Maj. opn., *ante*, at p. 29, fn. 17.)  Accordingly, I would affirm the judgment.


SMITH, J.

18

Filed 9/13/23

**<u>CERTIFIED FOR PUBLICATION</u>**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| JOSE CRUZ,<br><br>    Plaintiff and Appellant,<br><br>       v.<br><br>CITY OF MERCED,<br><br>    Defendant and Respondent. | F083402<br><br>(Merced Super. Ct.<br>No. 20CV-02663)<br><br><br>**ORDER GRANTING REQUEST<br>FOR PUBLICATION** |

As the nonpublished opinion filed on August 23, 2023, in the above entitled matter hereby meets the standards for publication specified in the California Rules of Court, rule 8.1105(c), it is ordered that the opinion be certified for publication in the Official Reports.


POOCHIGIAN, Acting P. J.

WE CONCUR:


DETJEN, J.


SMITH, J.